2023 IL App (1st) 230236

No. 1-23-0236

Second Division
June 20, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| IN RE MARRIAGE OF: | ) | Appeal from the |
| | ) | Seventeenth Judicial Circuit, |
| RICHARD C. EDSON, | ) | Boone County. |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| and | ) | No. 2016 D 4 |
| | ) | |
| JULEE C. EDSON, | ) | Honorable |
| | ) | Ronald A. Barch |
| Respondent-Appellee. | ) | Judge, presiding. |

_____

JUSTICE COBBS delivered the judgment of the court, with opinion.
Justices Howse and Ellis concurred in the judgment and opinion.

**OPINION**

¶ 1    This case stems from post-judgment dissolution of marriage proceedings between petitioner-appellant, Richard C. Edson (Richard), and respondent-appellee, Julee C. Edson (Julee).[1] Pursuant to a marital settlement agreement executed in 2017, Richard was ordered to pay monthly maintenance payments to Julee for a period of 20 years. However, in 2021, Richard filed

_____

[1]On February 6, 2023, in exercise of its general administrative and supervisory authority, this case was transferred by our supreme court from the Appellate Court, Fourth District to the First District pursuant to *In re Appellate Court, Fourth District, Case Transfer*s, Ill. S. Ct., M.R. 31650 (eff. Feb. 6, 2023) (Order M.R. 31650).

a petition to terminate such payments, alleging that Julee was cohabiting with another party on a "continuing conjugal basis" and that such a relationship constituted a *de facto* marriage under Illinois law.

¶ 2     Following a two-day bench trial, the trial court determined that Richard had failed to meet his burden on his petition in establishing that Julee was cohabiting with another in a resident, conjugal, and continuing relationship pursuant to the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/101 *et seq.* (West 2020)). Specifically, the court determined that, although Richard had established that Julee was involved in an intimate dating relationship, he had failed to establish by a preponderance of the evidence that she was in a *de facto* marriage. Richard appeals from that judgment, arguing that the trial court's ruling was against the manifest weight of the evidence. For the reasons that follow, we affirm the decision of the trial court.

¶ 3                                I. BACKGROUND

¶ 4                      A. The Parties' Divorce Proceedings

¶ 5     The following facts are derived from the record on appeal. Richard and Julee were married on July 15, 1995, in Rockford, Illinois. On January 8, 2016,[2] Richard filed a petition for dissolution of marriage in Boone County located in the Seventeenth Judicial Circuit.[3] At the time of filing, the couple had two minor children and were both Illinois residents.

---

[2]The court's final order indicated that Richard filed a petition for dissolution in 2018. The record reflects that it was filed on January 8, 2016.

[3]As pointed out by the trial court in its final order, pursuant to Public Act No. 102-11 (eff. June 4, 2021) (amending 705 ILCS 20/1 *et seq.*), the Seventeenth Judicial Circuit for Boone County was redistricted from the Appellate Court, Second District of Illinois to the Fourth District. This act provided that any appeal filed after January 1, 2022, was to be initiated in the new district designated therein. The act's implementation was briefly paused by our supreme court pursuant to *In re Judicial Redistricting*, Ill. S. Ct., M.R. 30858 (eff. June 7, 2021). The pause was lifted on December 8, 2021. For our purposes, our supreme court has stated that, in the event of any conflict between districts, the circuit court is bound by the decision of the appellate district of which it was situated at the time the circuit court action was initiated.

¶ 6    Following the entry of a temporary maintenance order, multiple statuses, and the setting of an initial trial date, the court entered a judgment for dissolution of marriage on June 23, 2017. The June 23, 2017, order provided that Richard had waived any challenges to the payment of maintenance, or alimony, to Julee. Further, Julee was to be awarded maintenance in accordance with the parties' executed Marital Settlement Agreement (MSA), which had been reduced to writing and was incorporated by reference and attached as an exhibit to the June 23 order. Specifically, the MSA provided that Julee was awarded monthly maintenance payments of $1922 for a period of 20 years, beginning on June 1, 2017. The MSA further "preclude[d] modification as provided by Section 502(f) of the [IMDMA]," but also that the payments were subject to the "terms and conditions of the [MSA] *** and Illinois law." The June 23 order mirrored such language.[4]

¶ 7                                   B. Procedural History

¶ 8                                   *1. Richard's Petition*

¶ 9    On August 2, 2021, Richard filed a petition to terminate maintenance payments to Julee. Richard alleged that there "had been a substantial change in circumstances" regarding the parties' agreement (*id.* § 502(f)) and that pursuant to section 510(c) of the Act (*id.* § 510(c)), maintenance should be terminated because Julee was cohabiting with a third party named Curt [*sic*] Leaich on a "continuing and conjugal basis." Specifically, Richard alleged that Julee and Curt cohabitated and held themselves out as a couple to both family and friends by attending family functions together; spending substantial time and overnights with one another; travelling and going on vacations together; spending holidays together and with friends and family on a regular basis;

_____
[4]On June 3, 2020, by agreed order, the parties further amended the MSA with regard to a retirement benefit that had not been contemplated by the parties at the time of drafting.

living and sharing meals together at Julee's residence; holding themselves out as a couple on social media; attending one of Richard and Julee's daughter's wedding, as well as financially contributing to the celebration together; and listing Curt as a family member in an obituary for one of Julee's relatives. As such, Richard asserted that the relationship rose to the level of a "*de facto*" marriage under Illinois law.

¶ 10    Julee filed a response, which admitted that she and Curt attended family functions together, that they travelled and vacationed together, that Curt had been identified in an obituary for her brother's death, and that she and Curt attended her daughter's wedding, as well as contributed to a wedding gift. However, Julee denied being in a *de facto* marriage and requested that the petition be denied.

¶ 11                                    *2. Hearing*

¶ 12    A hearing on Richard's petition was conducted by Zoom over two days—on February 4, 2022, and March 31, 2022. We have culled through the extensive testimony and recite the most salient portions herein.

¶ 13                              i. Isabelle Ponton

¶ 14    Richard called his and Julee's eldest daughter, Isabelle, who testified that Curt and her mother had started dating towards the end of October 2017. At the time, Isabelle; Julee; Isabelle's younger sister, Angelina; and Angelina's ex-boyfriend were all living together in Belvidere. They subsequently moved to a different location in Belvidere in November 2017. Curt and his three sons—Mason, Gavin, and Ethan—assisted them with the move. Isabelle stated that when they moved to the new residence, Curt bought a washer, dryer, and television for the home. Isabelle had been "upset" with the purchase because she "did not want to feel like a charity case." However,

Julee communicated to her that she intended to pay Curt back for the items. She was not aware if Curt had helped purchase other items for the house.

¶ 15    Isabelle testified that when they first started dating, Julee and Curt did not see each other "too often." She quantified it as "four times a month," although it was also her testimony that she did not remember exactly how often it was. Isabelle stated that Curt did not spend the night during that time period and that he and her mother were "just hanging out." However, it was also her testimony that she was not "really involved" in their relationship. Nevertheless, according to Isabelle, Julee and Curt spent Easter 2018 together, along with Isabelle, Angelina, their boyfriends, and Curt's children.

¶ 16    Isabelle stated that the couple's relationship began to change in summer 2018, when Curt began to "come around a lot more" and began to stay overnight at the residence. Isabelle characterized their activities as what "normal boyfriends and girlfriends do," such as hanging out at the house and playing bags. Isabelle observed them hugging, kissing, and holding hands. Isabelle stated that her mother was not seeing anyone else at the time. During that summer, Curt was present at the home on the weekends. When he was not at work, Curt was at the house. His work schedule depended on where his job location was, as he mostly worked out of town. He would stay overnight at Julee's house every other weekend, or on the weekdays if his job was close or within a few hours of Julee's home. When he stayed overnight, he slept in her mother's room. When he was at the house, Curt would help Julee with "simple things" and would work on Julee and Angelina's cars. He also put in flooring in her mother's basement, which had been Isabelle's uncle's project before he passed away in 2020.

¶ 17    Isabelle testified that she and Curt did not have a close relationship and would "butt heads" all the time because he would "put his two cents in" where she did not feel it was warranted.

Isabelle did not like Curt "being around so much" and did not like "feeling like a charity case." As such, following an argument with her mother with Curt present, Isabelle was told by Julee that she was being kicked out. Isabelle left the home and moved to her father's house, which was less than five minutes away. However, between September and December 2018, she would still visit her mother and sister every day and would stay about an hour or so each day. When she visited, she would sometimes see Curt, mostly on the weekends and perhaps one or two times during the week. She knew Curt was staying overnight because she would be there at the same time. After she moved out, Isabelle was aware that Curt was still "doing things" around the house.

¶ 18     At the end of 2018, Curt and her mother were still a couple and doing "normal things that boyfriends and girlfriends do." Isabelle testified that at the end of 2018 or beginning of 2019, her mother was hospitalized for chest pain. Isabelle called Curt while he was on his way to work, and he came to the hospital to join her.

¶ 19     With regard to holidays that year, Isabelle testified that she spent Thanksgiving 2018 at her mother's house, with Curt, his three sons, his parents, and his nephew present. On Christmas 2018, Isabelle spent the day with both her parents. Curt was at Julee's home with two of his sons.

¶ 20     In 2019, Isabelle continued to visit her mother almost every day. She would be at the house for a couple of hours and would still see Curt mostly on the weekends. In March 2019, Isabelle underwent shoulder surgery, and stayed with her mother for about a week or two to recover. At some point that same month, Curt was laid off from his job, but Isabelle was unaware of the details relating to that event. During that time, he would be at her mother's house almost every day and would spend the night on the weekends. However, it was also Isabelle's testimony that she was unsure about whether he had been there during the week.

¶ 21    With regard to holidays in 2019, Isabelle spent Easter and Memorial Day at her mother's house, with Curt and his three sons also present. Isabelle also spent the Fourth of July and Labor Day there. Curt was present but no one else from his family was. She testified that her mother and Curt's behavior towards each other was the same.

¶ 22    In 2020, Isabelle testified that she and her father moved to Union Grove, Wisconsin, about an hour and a half's time from her mother's home. Isabelle still visited her mother with regularity, about once or twice a week. If she was there on the weekends, she stayed overnight and would see Curt. She described Curt and Julee's relationship as "loving" and "the same as before," and that Curt was still sleeping in her mother's bedroom when she was there. As to holidays in 2020, Isabelle testified that she spent Easter, Memorial Day, the Fourth of July, and Christmas with her mother. She remembered Curt being present at all events but was unsure if his relatives had been present each time. However, two of his sons were present on Christmas.

¶ 23    Isabelle testified that she moved out of her father's home in January 2021 to live with her husband, Thomas Ponton, who lived in West Allis, Wisconsin. West Allis was about the same distance to her mother's house, and so Isabelle would still visit her mother every weekend. She would see Curt, her mother, and her sister, with Curt still sleeping overnight in her mother's bedroom. As to holidays in 2021, Isabelle spent every holiday except Thanksgiving at her mother's house. At Christmas 2021, Curt was also there, along with his two youngest sons. He did not have any other relatives present.

¶ 24    In 2021, Isabelle testified that, at some point, one of Curt's sons, Gavin, began living with Julee when he began studying for the GED exam. Gavin was 18 or 19 years old at the time and did not have a job. Isabelle was aware that Gavin was living with Curt at the time and that Curt paid his expenses. Gavin resided with Julee on a full-time basis during that time, but "gave up" on his

GED studies and was told by her mother that he could no longer stay at her home. She did not know how long Gavin's stay was but knew that he went back to Curt's home thereafter.

¶ 25    Isabelle testified that in August 2021, she observed some changes in Julee and Curt's relationship, specifically them no longer sharing a bedroom. Isabelle inquired about the arrangement to Julee, and her mother responded that it was because Curt snored. That same month, Isabelle asked Julee why she would not marry Curt. Her mother listed various reasons, such as Curt being "too emotional," and that she did not want to lose her maintenance payments because she would likely lose the house if payments terminated. In October 2021, Isabelle asked her again about the maintenance payments. Julee stated that she felt that she deserved the money because she had always taken care of the children, had attended all of their sporting events, and had done all of the household chores, whereas Richard had not been as present.

¶ 26    With regard to vacations and trips, Isabelle testified that Julee began selling wrestling gear as a second job in 2019 and would go on business trips for tournaments. The tournaments would be every weekend or every other weekend, usually in the winter or spring, and her mother would sell the gear for about three months during the year. The trips would be both local and long-distance, but normally more local. Curt would travel with her, but Angelina's ex-boyfriend also did as well. However, the wrestling tournament business trips ceased in 2020 due to COVID.

¶ 27    With regard to leisure trips, Isabelle testified that Julee and Curt went to Florida for Julee's fiftieth birthday but was unaware of its timeframe and who paid for its expenses. The two also travelled together for Isabelle's wedding to Thomas in Las Vegas in June 2021. Other guests included Richard, Richard's girlfriend, and some of Thomas' cousins. Isabelle and Thomas stayed in Las Vegas for six days while the others stayed for about three. Julee and Curt shared a room, and Isabelle received some financial assistance for the wedding from Curt of around $800.

¶ 28    With regard to her mother's relationship with Curt's family, Isabelle testified that both families treated each other as such. Isabelle stated that her mother would give Curt's children a call "every once in a while" to check in on them. Additionally, Curt's son Mason graduated from navy training in January 2020, and Isabelle, Julee, Curt, Mason's mother, Angelina, and some of Mason's friends ate lunch together afterward. However, Isabelle had not been present for the actual ceremony. Isabelle also testified that her uncle Jerry, Julee's brother, had recently passed away and an obituary had been written for him. Both her mother and Curt's names were included therein, with Curt named as "Curt Edson" in the passage.

¶ 29    On cross-examination, Isabelle testified that her mother had been employed at Rockford Spine Center for 12 years. She stated that Curt did not co-own her mother's home and that he did not help her pay the mortgage, utilities, or her cell phone bill. She did not have any reason to believe that the two shared a bank account or credit card. With regard to household chores, Isabelle testified that Curt put in the flooring for the house but did not believe he had paid for the materials. Isabelle stated that she was not aware if her mother had repaid Curt for the washer, dryer, and television, but would not be surprised if she had paid him back. She also did not have any reason to believe that her mother wanted to marry Curt and believed her with regard to her not wanting to marry him outside of financial concerns.

¶ 30    Isabelle clarified that Curt would not be at her mother's home every single weekend, but "a majority of the time he was there." However, Isabelle admitted that, after she moved out of her mother's house, she herself was not there every weekend to know if Curt was too. She also was not present when Gavin stayed with her mother, which she estimated to have been about a month, although she admitted that she did not "really keep tabs on [Curt's] son." She was not sure why Gavin stayed with her mother as he was living with Curt at the time. She believed Curt was paying

for Gavin's expenses because he did not have a job at the time and did not know if Curt had given Julee money for Gavin's expenses when he had stayed with her. She had never been to Curt's home, located in Perryville, Illinois, but had seen its exterior when she dropped off one of his sons there. She knew that Curt had lived there for over 10 years.

¶ 31    Isabelle testified that she was unaware that Curt had been planning to take his mother on the Florida trip or that his mother had gotten sick about a week prior. Isabelle was not aware that her mother had paid for her own airfare and expenses to attend her wedding in Las Vegas. However, she had reason to believe that Julee had not paid for her own airfare, as Curt had told Isabelle that he had paid for both tickets. Isabelle did not consider the $800 Curt gave her to be a wedding gift because he stated that he would "help [her]" with the wedding. However, she admitted that he did not give her any other gift and that she did not have a registry.

¶ 32    The court then questioned Isabelle. Isabelle testified that she had never seen any mail addressed to Curt being delivered to her mother's house at any time she lived with or visited her on weekends. However, Curt was able to get in and out of the house because he had the garage code, and he would sometimes be present at the home without her mother there. Curt stored belongings at her mother's house, such as shampoos, conditioners, and body washes. He also left some shirts but would often bring work clothes with him as he was gone for weeks at a time. Curt would also keep some tools in a small bag at her mother's house and would leave them in the garage. If he needed a bigger tool, such as a saw, he would return to his house to retrieve it. He would also bring some items from home and take them back with him.

¶ 33    On recross examination, Isabelle clarified that "every once in a while" Curt would be at her mother's house on his own but was unsure about the frequency once she moved out. She further

stated that "every once in a while" Curt would work on her mother and sister's cars, which is why he left some tools in the garage.

¶ 34    On redirect examination, Isabelle testified that Curt's tools were not currently stored at her mother's home. A few of his shirts were hung up at the home, and a few items were stored in her mother's dresser. She further stated that another one of Curt's sons, Mason, stayed with her mother for about two weeks, while he was on leave from the navy around December 2020.

¶ 35                                    ii. Thomas Ponton

¶ 36    Richard called Thomas, Isabelle's husband, who testified that he and Isabelle met in either August or September of 2020, and began dating on December 26, 2020. He resided in West Allis, and she moved in with him in January 2021. Thomas met Julee, Curt, and Mason on December 26, 2020, when he and Isabelle went to Belvidere and stayed the night at Julee's house.

¶ 37    Thomas testified that he and Isabelle would visit Illinois every other weekend. Curt would also be there almost every weekend they were there and would stay overnight. Sometimes his kids would be present, but they would not stay for the night. Curt and Julee would share a bedroom, but this arrangement ended in August or September of 2021 because Curt snored.

¶ 38    Thomas testified that Julee and Curt "interact[ed] like a couple" because they would cook together, go to dinner, go to the casino, have a cookout or campfire, and were "always together." He and Isabelle recently had lunch with them, and Julee paid for their meal. Curt also paid for meals, with the last time being sometime in October 2021. Between June to December 2021, Thomas recalled eating out with Julee and Curt about five to six times, with Curt covering the bill. Thomas stated that Julee always tried to pay, but Curt would always pay beforehand.

¶ 39    Thomas testified that in January 2021, he had a conversation with Julee about her relationship with Curt. Julee told Thomas that she loved Curt but did not want to marry him

because she "didn't want to lose the money." Thomas asked her if it was "pretty much about the money." Julee responded that if she got married, she would lose her house. He and Julee had another conversation about marriage two weeks after. He asked her, "Do you just keep the money because that's the only thing you have left of [Richard]?" Julee said no, and that she deserved the maintenance payments because "she did everything for the kids," such as making them dinner and taking them to their practices, while Richard came home, ate, and slept.

¶ 40    On cross-examination, Thomas testified that he accompanied Julee and Curt to the casino, and that he was not aware of Curt paying for Julee there. At restaurants, Curt and Julee never made him and Isabelle pay for meals. Either Julee or Curt would offer to pay, but more often than not, Curt would.

¶ 41                                        iii. Craig Johnson

¶ 42    Craig Johnson, a private investigator employed at Markely Investigations, was also called by Richard as a witness. Johnson testified that he was assigned a matter relating to the Edson divorce. His assignment was to go to an address in Rockford, Illinois, and to look for certain vehicles or a tractor parked in front of a house on Palos Verde Drive.

¶ 43    He began his investigation on May 7, 2021. At about 8 or 9 p.m., Johnson drove to the Rockford address. While he was there, he observed a dark-colored Fiat with Illinois plates parked in front of the residence, as well as a cream-colored SUV also with Illinois plates. Johnson stayed for a brief time and took some photographs, which he positively identified on the stand. On May 8, 2021, he returned to the same address at about 6 a.m. He observed the black Fiat and cream-colored SUV still parked in the same location. He also observed a light-colored Chevy van parked in the driveway. Johnson positively identified copies of the photographs he took that morning.

¶ 44     On cross-examination, Johnson testified that he was given his assignment a few days before May 7, 2021, and he performed work on May 7 and 8, 2021, and some dates in January 2022. On May 7 and 8, 2021, he did not observe any individuals enter or leave the residence.

¶ 45     On redirect examination, Johnson testified that on January 29, 2022, at 5:45 a.m., he returned to the same address, and observed the same cream-colored SUV, as well as a white Scion in the driveway of the residence. He took photographs of the vehicles and stayed for a few minutes. On January 30, 2022, he returned to the same residence at 6:06 a.m., observed the same cars still parked in the driveway, and again took photographs. Johnson positively identified such photographs on the stand. On recross-examination, Johnson testified that he did not see anyone leaving or entering the residence on January 29 or 30, 2022.

¶ 46                                                   iv. Richard Edson

¶ 47     Richard testified in his own behalf. He testified that he had been previously married to Julee and that, by court order, he was required to pay maintenance to Julee on a permanent basis of $1922 per month.

¶ 48     Richard believed Julee was cohabiting with another individual and that he began his own investigation of the relationship through social media and by taking photographs. When he was in Rockford to visit his daughter, he would take pictures of and around the house, including in the early morning hours. Richard positively identified various photographs on the stand, which depicted Curt's cars parked at Julee's residence or at her job. He knew the Fiat was Curt's car because he had spoken generally with Curt about it regarding fuel capacity and mileage. He also knew that the Scion was also Curt's car because Curt had purchased it from Julee's parents.

¶ 49     Richard also identified photographs taken at his daughter Isabelle's wedding in Las Vegas. He testified that there were about 15 people at the wedding, including Julee, Curt, Richard's friend

Gina, himself, Angelina, Thomas' eldest daughter, and Julee's extended family and their significant others. Richard had some conversations with Julee regarding the wedding's cost prior to Isabelle buying her wedding dress. He had been concerned about helping Isabelle pay for the wedding but told Julee that he did not have a lot of extra money set aside; thus, he planned to give Isabelle about $2000. Julee responded that she and Curt would give $1800 to help with the overall cost. After Isabelle received the money, Richard asked Julee if she planned on giving Isabelle and Thomas a wedding gift. Julee stated that she and Curt did not plan to, as they had contributed to the cost of the wedding.

¶ 50    Richard identified various text messages between him and Julee concerning maintenance, beginning on April 5, 2021, through July 12, 2021, in which Julee stated that she was "entitled" to the money. The two also had a phone conversation in April 2021, in which Julee complained of having to pay taxes on the maintenance payments. Richard responded that she would not have to do so if she dropped the maintenance obligation and that it was only fair that she did because "Curt is there all the time." Julee refused to continue the conversation and hung up the phone.

¶ 51    On cross-examination, Richard testified that a limousine had been utilized for Isabelle's wedding in Las Vegas, but Curt had not ridden in it with him, Julee, and Richard's friend. On redirect examination, Richard testified that Curt had a rental car in Las Vegas in order to get around the city.

¶ 52                                  v. Curt Leiach

¶ 53    Richard next called Curt, who testified that he was employed by Fabcon Precast, LLC, as a technician and worked about 90% of the time out of town.[5] When he was out of town, he would usually stay at a location for an entire week, and sometimes up to three to four weeks, including weekends. Curt testified that, "if he was lucky," he was home about six days a month. He indicated that he would get vacation time for the holidays, including the day before and after a given holiday.

¶ 54    Curt testified that he did not own a home and instead rented an apartment in Caledonia, Illinois. His son, Gavin, had lived there with him for the past four years. Curt paid all the expenses at the rental, including utilities, and he performed repairs and maintenance. His apartment was about three miles from Julee's residence.

¶ 55    Curt testified that he had gone to high school with Julee and had now dated her on and off for four years. Curt testified that when he is in town, Julee and he occasionally eat out and visit family. Curt did not consider himself a "homebody," and he was usually "packing in everything [he could] to make sure everything was taken care of" when he was in town, which included spending time with Julee. Based on his work schedule, he would see her once every couple of weekends, between two to five times a month. When Isabelle was still living at Julee's home, Curt would sometimes see her there. He would stay overnight at Julee's house "on occasion" and would usually do so when he had consumed alcohol that night. He stated that when he stays overnight now, he "normally" does not stay in Julee's bedroom, but that he has on occasion.

¶ 56    When asked about the type of activities he and Julee do together, Curt responded that they do the "same kind of things that somebody is dating would do," such as clothes shopping or

---

[5]The parties indicated to the trial court that both Richard and Julee would call Curt as a witness. The parties agreed that Julee's direct examination of Curt could exceed the scope of Richard's direct examination, without any objection from Richard.

running errands. However, he reiterated that he did not have a lot of free time when he was in town.

¶ 57    Curt testified that he considered himself "handy" and helped Julee with projects and maintenance around her house. Specifically, he helped finish her basement remodel after her brother passed away. Such tasks included studding of the drywall, various electrical repairs, painting, and finishing. He had not completed any other major projects at her house. However, if he was in town, he would do small projects, such as raking and mowing her lawn, landscape work, and cleaning out her garage or basement at various times. He had not done any tiling or staining or helped her clean out any closets or take down any windows. If something would break, he would fix it, including her and her children's vehicles, which included "major type repairs," such as brake repair, tune-ups, and suspension work. He also worked on Isabelle's car after she moved out of the house.

¶ 58    As for his own car, Curt testified that he purchased a Chevy van before Julee's brother passed away and later sold it to another one of Julee's brothers. He denied giving the proceeds of the sale to Julee to pay attorney fees and stated that he has never given her any money for such fees. Curt testified that he also owned other vehicles, including a 2012 or 2013 black Fiat and a 2013 white Scion, which he purchased from Julee's parents.

¶ 59    Curt testified that he took one vacation with Julee to Fort Myers, Florida in 2020 for about a week. The trip had originally been planned for him and his mother, but his mother had been unable to go. The vacation happened to fall on Julee's birthday, so he took the trip with her instead and paid for the vacation. Curt also travelled between 10 and 20 times on long-distance trips with Julee while she sold wrestling gear during a two-year period. Curt stated that they travelled "quite a few times" to Michigan, once to Arkansas, once to Missouri, once to Virginia, and once to South

Dakota. Julee would pay for the trips' expenses. Curt estimated that he only accompanied her on one or two local business trips. For those trips, she usually travelled by herself or took one of her kids with her. When he did travel with her, he would help her set up her gear and sometimes assist with sales.

¶ 60    Curt testified that his family would get together at Julee's house about twice a year, excluding holidays, with both sets of their children present. Sometimes members of his extended family would be included for events, such as birthday parties. Curt stated that Julee had recently hosted a party for his son, Mason, at her home, with the majority of the attendees being his extended family. He characterized his extended family's relationship with Julee as friendly, but not close, and that his and Julee's children were also friendly. When asked about Julee's brother's obituary, Curt confirmed that he was included in the obituary, along with her other relatives.

¶ 61    With regard to holidays, Curt testified that he spent "some" holidays with Julee, including two Thanksgivings, two Christmases, and one Easter. He did not recall being together on the Fourth of July, Labor Day, or Memorial Day. He would also spend some holidays at his parents' home. Sometimes his extended family would be invited to spend holidays at Julee's home, but they often celebrated separately. His children and Julee's children would sometimes be present during the holidays, but not always.

¶ 62    When asked about Gavin's stay with Julee, Curt testified that Gavin had been there for two weeks in order to study for his GED. However, when he did not pass the exam, Julee asked him to leave, and he returned to Curt's home. The stay had not been intended to last for more than two weeks. Julee did not charge him or Gavin for the stay.

¶ 63    As to Isabelle's wedding in Las Vegas, Curt testified that he had rented a car because "people needed to get to places" and that he paid for the rental. He stayed with Julee and Julee's granddaughter in a hotel room.

¶ 64    Curt was shown various photos and social media postings and positively identified them as postings he had made, photos he took, or times he had been with Julee and others, ranging from events such as Mason's graduation to cooking dinner at Julee's home. He also identified a photo from October 2019, in which Julee visited him for one night while he was on location for work in Plainfield, Indiana. Curt testified that Julee had driven down for the day and stayed in the same motel. Curt indicated that this was the only time she had done that in their time together. He also identified a social media post he made in April 2020 to help promote Julee's wrestling gear business.

¶ 65    On cross-examination, Curt testified that he had been helping Julee's brother with her basement project and finished it after he died. Julee purchased the supplies for it, and he did not contribute any money towards it. He confirmed that the flooring he installed was part of the same project.

¶ 66    With regard to the Florida trip, Curt testified that he had not originally planned to celebrate Julee's fiftieth birthday with her. When they were in Florida, they stayed at his cousin's house for free in exchange for some maintenance and repair work. However, he paid for his own food and expenses while there. With regard to long-distance business trips, Curt testified that Julee could not drive well at night, so he did all the driving at that time. He also did most of the driving during the day, as Julee could not drive for more than three hours at a time.

¶ 67    With regard to holidays, Curt testified that he usually spent the Fourth of July with his family, while Julee spent it with hers. When asked about the obituary, Curt stated that he was

surprised that he was listed, that he had not asked to be, and that he was not aware that Julee had asked anyone to include him in it.

¶ 68    Curt was subsequently called to testify by Julee. On direct examination, Curt testified that about a year into their relationship, he and Julee separated for about five to six months. He and Julee were not engaged. When asked by the court about what his relationship with Julee was currently, he responded, "she is my girlfriend" and "best friend."

¶ 69    Curt testified that he rented a single-family home in Caledonia and had an agreement with his landlord for a month-to-month lease in exchange for doing general maintenance and upkeep. He had lived there for twelve years, paid the utilities, and had all of his mail delivered to that address. Julee never assisted him with his rent.

¶ 70    Curt testified that his employment took him away from home about every week and when he was home, it was usually on the weekends. He estimated in the last three to four years with Julee, he had spent about two to four days a month with her and usually not the whole weekend. He did not spend every night with her and would sometimes go back to his house. He did not keep many personal items at her home and did not have his own dresser there. If he stayed the night, he would bring his own toiletries. He might bring items with him if it was in his out-of-town bag in the car, but most of the time he left his belongings at his home. He did not have any furniture at Julee's house but had left some tools in the house from the basement project. He would use those same tools when working on the cars or would use the tools she inherited from her brother after he died. If he needed a specialized tool, he would go back to his own home for it and then return it to his home when he was finished.

¶ 71    Curt testified that he has his own bank account and credit card and does not share—

and has never shared—any accounts with Julee. He does not assist Julee with her mortgage, bills, or loans. Curt has never loaned her any money, besides the money spent on the washer, dryer, and television, which he gave to her because she was moving into a rental home that did not have any of those items and "she had kids." However, she repaid him for all the items. Curt's sons are his beneficiaries on all of his financial accounts, including his life insurance policy. Julee is not his beneficiary, and they had not engaged in any financial transactions together.

¶ 72    Curt testified that he does not have keys to Julee's home but was aware that her garage door has a code that allows entry. He currently did not have access to the code, but he did when he was working on her basement in order to bring in materials. When the project was completed in 2021, Julee changed the code. He has only accessed the home without her being present if she leaves the side door of the home unlocked on occasion in order for him to perform maintenance work.

¶ 73    Curt testified that he and Julee occasionally eat out with Isabelle and Thomas and estimated it to be about three times since the two were married. Curt stated that he usually pays for meals, but he knew that Julee paid at least once. Curt paid for the meals because he knew "money [was] tight for the kids" and that he normally covers the bill when children are involved. With regard to Isabelle's wedding, Curt testified that he did not pay for Julee's airfare and that, as far as he knew, Julee paid for the hotel room.

¶ 74    On redirect examination and cross-examination by Richard, Curt testified that, with regard to the Florida trip, he had planned to be there with his mother on Julee's fiftieth birthday and had not otherwise intended to celebrate with Julee because she did not want to. He testified that, prior to the changes to the trip plan, he had wanted to celebrate with her because she was his best friend.

¶ 75                                vi. Julee Edson[6]

¶ 76     Julee was first called by Richard. On direct examination, she stated that she had two daughters with Richard, and one of them still lived with her. She testified that Richard was current in his maintenance payments but did not remember having a conversation with him about him continuing to pay maintenance until her mortgage was paid off.

¶ 77     Julee testified that she first started dating Curt in November 2017 and was still dating him at the time of trial. Julee was shown various photographs and social media postings depicting her, Curt, some members of her family, and some members of Curt's family beginning in February 2018 through June 2021, although she was not certain of all the dates. Julee stated that some photographs were taken in Belvidere, while others were in Wisconsin, and that they depicted events ranging from Isabelle's wedding to average days spent together alone or with members of both their families.

¶ 78     Julee testified that she recently hosted a party for Curt's son, Mason, who was in the navy and was home for two weeks. There were about 15 to 20 people in attendance, a majority of whom were Curt and Mason's relatives, including Curt's ex-wife; his brothers, their wives and kids; and Curt's ex-mother-in-law. Some members of Julee's family—Isabelle, Thomas, Thomas's children, and their partners—also attended. Julee was the host, but only provided pop and water at her own expense.

¶ 79     Julee was shown a photograph from July 2019, which showed her and Curt at Mount Rushmore. Julee testified that she had taken a business trip with Curt to sell wrestling gear, where she would travel to wrestling tournaments, both local and long-distance. She conducted either two

---

[6]Julee was called as both a witness by Richard and on her own behalf in rebuttal. For purposes of efficiency, we recite the whole of her testimony in a single section.

or three nonlocal business trips during a one-year period, and Curt came with her on all those occasions and helped her sell gear. Such trips included trips to South Dakota, West Virginia, and Michigan. Julee paid all expenses, such as gas and lodging, through her employer, Go Earn It, but the two stayed in the same hotel. Curt paid for his own food and would contribute to the driving, as some trips were about three days' travel time. Julee's local business trips would be about two hours away, and Curt accompanied her on one trip to Washington, Illinois. They did not stay overnight.

¶ 80    Next, Julee testified on her own behalf in rebuttal. Then, on direct examination, she testified that since the divorce, she had never lived with another man. She identified Curt as a "very good friend," her "companion," and "someone I can go and do things with." She was not engaged to him, had never exchanged rings with him, and did not live with him. With regard to marriage, Julee stated that they had "not been together long enough to consider" it. When asked why three to four years was not long enough, Julee responded that "within the four years[,] we have not spent enough time together" to really get to know each other. However, she was exclusively involved with Curt and was not dating anyone else.

¶ 81    With regard to the frequency in which the two saw each other, Julee stated that Isabelle's testimony regarding Curt's overnight stays was not accurate. She testified that there were times when Curt was in town and she would not see him and that the time they saw each other was "not very often." She estimated that, when he was in town, they were together about half of the time.

¶ 82    Julee testified that she currently had a mortgage solely in her name and did not receive any assistance with it. She paid her own real estate taxes and utilities, also in her name. She had credit cards but did not share any with Curt and he did not help her pay them. She did not assist Curt with any of his household or personal bills or debt. She also had a life insurance policy that named

her two daughters as her beneficiaries. She did not share any financial accounts with Curt. Curt did not store any furniture at her home. With regard to the washer, dryer, and television purchase, Julee testified that Curt paid for them on his credit card, and she repaid him within two to three months after she received a work bonus. However, he had never purchased another "big ticket" item for her.

¶ 83    Julee admitted that Curt had assisted with car repairs over the last four years because her car was old and "a lot goes wrong with [it]." Julee testified that when there was an issue, she generally asked him to fix it rather than going to a repair shop. The same would be true with regard to her daughters' cars. Julee stated that she has also borrowed Curt's white Scion, specifically in summer 2020, when the air conditioning was not working in her vehicle. Julee confirmed that both she and Curt performed yard work at her home and that he would offer to do it while he was in town. As to the basement project, Julee confirmed that she purchased the materials for it.

¶ 84    With regard to Mason's recent party at her house, Julee stated that she hosted it at her home because she and Isabelle were allergic to cats and her house was a "happy medium." Curt paid for the meat, she served pop and water, and everyone else bought a dish to share. As for Isabelle's wedding, Julee testified that she paid for her own airfare, hotel expenses, and food, as well as her daughter Angelina's. She did not pay for Curt.

¶ 85    When asked about Gavin's stay at her home, she confirmed that he stayed during "springtime" 2021 because he needed to focus on getting his GED. Julee hoped he could finish it within two weeks, but he took the test and did not pass. He stayed at her house because "she had wi-fi" and, at the time, Angelina's ex-boyfriend, Bryce, was living with her and also needed to take the exam. She believed they could work together on it. However, she asked Gavin to leave when it was clear that he was not doing enough studying.

¶ 86    With regard to the Florida trip, Julee testified that she was asked by Curt to go about a week prior. She had not originally planned on going but did not want to stay in Illinois to celebrate her birthday. She admitted that she did not pay for any expenses for the six-day trip. Other than that trip and her work trips, she has never taken any other out-of-town trips with Curt. As to her work trips, she stated that Curt would travel with her because she could not drive more than three hours, as she would fall asleep, and could not drive at night because her vision was bad. Julee confirmed that he helped her set up booths on her work trips.

¶ 87    With regard to her brother's obituary, she indicated that her sister helped write it, but had not consulted Julee as to whether Curt should be included. Julee did not write it and could not revise it, and pointed out that Curt's name was improperly delineated as "Curt Edson." She asked, "why is this even in here?" and said that it was "not appropriate to list him in it because he was not in any form of a family member."

¶ 88    With regard to holidays, Julee testified that she and Curt spent two Christmases, Easter 2018, Fourth of July 2018, and maybe two or three Thanksgivings together. She also thought they were together on the weekend of Memorial Day 2018 because it coincided with Isabelle's birthday. She later changed her testimony, stating that they spent three Christmases together, in 2018, 2020, and 2021. She believed they spent Thanksgiving 2019 and 2020 together.

¶ 89    On cross-examination by Richard, Julee testified she spent Thanksgiving and Christmas 2018 with Curt, along with Angelina and Julee's brother, Jim. Curt's relatives were not present. In 2020, she spent Christmas with him at her house, along with Angelina, Isabelle, Gavin, and Ethan. In 2021, she spent Christmas at her house, along with some members of her extended family— Thomas, Isabelle, Thomas's three children, Ethan, and Gavin. She hosted Easter 2018-at her house, and Curt's parents, Curt, Angelina, Bryce, Ethan, and Gavin were present. On Memorial Day

weekend 2018, the holiday was spent at her house with Isabelle, Angelina, and some friends. Curt came for Memorial Day but not Isabelle's birthday. For Fourth of July 2018, also at her house, Curt, Isabelle, Angelina, and some of their daughter's friends were there. Julee hosted Thanksgiving 2018, 2019, and 2020 at her house. In 2018, her brothers, Curt, and Curt's mom attended. However, she later clarified that Curt was not present. In 2019, Curt, his parents, Ethan, Gavin, Isabelle, and Angelina were present. In 2020, Curt, Isabelle, and Angelina attended.

¶ 90     As to Gavin's stay, Julee testified that he had been welcome at her house so long as he focused on his studies and that she had put a time limit on it. She clarified that if he had "been doing what he was supposed to be doing," he could have stayed longer, but she had to "put a limit on these kids." Finally, Julee confirmed that Curt's testimony about their long-distance trips together was accurate, and that she had forgotten about the trips to Missouri and Arkansas.

¶ 91                    *3. Closing Arguments*

¶ 92     The parties submitted written closing arguments. In Richard's submission, he asked for the termination of maintenance to be retroactive to August 2, 2021, the date he filed the petition. Substantively, he argued that the evidence demonstrated the existence of a *de facto* husband and wife relationship.

¶ 93     Julee filed a response, which acknowledged that she and Curt had a close relationship over the past four years. Julee did not dispute most of the testimony elicited at trial but disagreed with Thomas and Isabelle's testimony regarding the amount of time Curt and her spent together. Julee emphasized that she and Curt maintained separate residences and finances, which would otherwise be routine for a married couple.

¶ 94     Richard filed a reply and supplement to his petition. Richard argued that Julee was minimizing the amount of time she and Curt spent together and that Julee had motivation to change

her behavior with regard to Curt in order to keep the maintenance award. Richard acknowledged that financial considerations were an important part of the court's analysis, but that Julee's focus on those aspects of the relationship minimized the other salient testimony.

¶ 95                                                      *4. Trial Court Ruling*

¶ 96     On July 13, 2022, the trial court entered a written order denying Richard's petition. The court held, based on the totality of the circumstances, that although Richard had established that there was a substantial romantic relationship between Curt and Julee, he had failed to meet his burden, based on a preponderance of the evidence, in establishing a *de facto* marriage at least as of August 2021, the date the petition was filed.[7]

¶ 97     The court stated that section 510(c) of the Act governed resolution of Richard's petition on the issue of cohabitation.[8] The court cited the case of *In re Marriage of Miller*, 2015 IL App (2d) 140530, as a leading case on cohabitation, which had formally adopted what has been termed as the "*Herrin*" factors, nonexhaustive factors to determine whether a *de facto* marriage existed. *In re Marriage of Herrin*, 262 Ill. App 3d 573 (1994). However, the court cautioned that the six *Herrin* factors did "not constitute a mere checklist" in assessing the evidence. The court was also "mindful [that] the circumstances of an intimate dating relationship are also likely to involve facts that fit the 6 factors established in *Herrin*, yet those same facts may fall short of establishing a *de facto* marriage" because "simply put, an intimate dating relationship is not a *de facto* marriage

---

[7]Due to the length and heavy detail of the trial court's factual findings, we shall recite such findings within the analysis section of this order. The court also stated that it had admitted virtually all of Richard's exhibits into evidence, which were delineated therein.

[8]The trial court stated that the court in which it sat had been redistricted from the Illinois Appellate Court, Second District, to the Fourth District. However, it noted that there was no true substantive conflict regarding the governing case law as applied to its resolution of the matter, as its ultimate conclusion relied in part on a Second District decision, which in turn had cited with approval a Fourth District opinion.

and, therefore, not a ground upon which to terminate or deny maintenance." Instead, the court reasoned, the record was to be evaluated for signs of mutual commitment and permanence, as well as whether the "new relationship functions practically and economically like a marriage and, if not, whether [there] is a reasonable explanation [for that]." The court further reiterated that "[e]ach cohabitation case turns on its own set of facts; just as no two relationships are alike, no two cohabitation cases are alike."

¶ 98    Ultimately, the court found that Richard had not proven the existence of a *de facto* marriage, although it acknowledged the "closeness" of the case by stating that:

> "If the court were to simply fill in the 6 *Herrin* factors with evidence brought forth at trial, the court may be inclined to agree with Richard on the question of cohabitation, but that is precisely the calculus *Miller* counsels against. As noted above, courts must be careful to not use the 6 factors set forth in *Herrin* as a mere checklist on the way to finding a *de facto* marriage."

¶ 99    On this point, the court gave credence to Richard's emphasis on the social and emotional aspects of the relationship and agreed that "on the surface, the duration *** and nature of the relationship suggest a deeply rooted relationship with many earmarks of a married couple." The court noted that it was clear that Julee and Curt were engaged in a long-term, monogamous romantic relationship, which included sexual intimacy, time spent together alone and with each other's families, and holding themselves out as a couple in public and at family events.

¶ 100   However, the court noted, "[u]pon closer analysis, *** the relationship lacks the depth of commitment necessary for the court to find a *de facto* marriage" and that "a deeper dive *** reveals something better described as an exclusive social companionship with occasional benefits, rather than a *de facto* marriage." The court reasoned that Curt and Julee had "completely and

consistently" maintained separate households and finances, with the exception being the loan for the washer, dryer, and television, which was repaid quickly. The court opined that "[o]n a practical and economic level, Julee and Curt could end their relationship and go their own way with virtually no effect whatsoever[.]" As such, the court found the social and emotional aspects of the relationship to "carry less weight" against the financial considerations. The court acknowledged that there was testimony regarding Julee's need to maintain her maintenance award as a reason for avoiding marriage, but that was also balanced against other additional reasons as to why she did not want to marry Curt, which was further corroborated by Isabelle's testimony.

¶ 101   As such, the court concluded that Julee and Curt's relationship was "one lacking the significant practical and economic hallmarks of a marriage-like relationship." The court emphasized that if the two were to separate, they could do so with "nothing more than a final phone call or perhaps a text" and that there "exists nothing between the two that would require unwinding or disentanglement."[9]

¶ 102   On July 28, 2022, Richard filed a timely notice of appeal to the Appellate Court, Fourth District.[10] On February 6, 2023, our supreme court transferred the matter from the Fourth District to the First District pursuant to Order M.R. 31650. This appeal followed.

---

[9]Although the court expressly noted in its order that Richard was also seeking to terminate his maintenance obligations retroactively, the court never addressed this request in its final order as it ultimately denied the petition in its entirety.

[10]Although not raised by either party, it is our duty to assess our jurisdiction to review this appeal. See *State Farm Fire & Casualty Co. v. John J. Rickhoff Sheet Meal Co.*, 394 Ill. App. 3d 548, 555 (2009). The record reflects that the trial court's July 13 final order does not expressly indicate that it was final and appealable, and instead sets the matter over for another status. However, the order clearly disposes of the entirety of the pending matter, and Richard did not file a post-judgment motion. Thus, his notice of appeal was timely pursuant to Illinois Supreme Court Rule 303(a) (eff. July 1, 2017) (final judgments of the circuit court in civil cases must be appealed within 30 days of entry of the final judgment, or 30 days after the entry of judgment against a timely post-judgment motion directed at that final judgment).

¶ 103                              II. ANALYSIS

¶ 104                         A. Standard of Review

¶ 105   Upon reviewing a trial court's ruling on a petition to terminate maintenance based on the existence of a *de facto* marriage, we will not disturb the court's conclusion, unless that ruling is against the manifest weight of the evidence. *Miller*, 2015 IL App (2d) 140530, ¶ 40. "A decision is against the manifest weight of the evidence if the opposite conclusion is clearly evident or if the decision is unreasonable, arbitrary, or not based on the evidence." *Id.* Generally, we also will not disturb a trial court's credibility determinations. *Id.* ¶ 41.

¶ 106                              B. The Act

¶ 107   We begin with a discussion of the governing statute, the Act, which controls the modification or termination of a maintenance award. Generally, courts are empowered to determine entitlement to and details of a maintenance award. 750 ILCS 5/504(a) (West 2020). However, the Act also allows for parties to "enter into an agreement containing provisions for disposition of any property owned by either of them," including "maintenance of either of them [or] support." *Id.* § 502(a). Any such agreement must be reduced to writing and approved by a court. *Id.* Further, "[t]he terms of the agreement, except those providing for the support and parental responsibility [for] allocation of children, are binding upon the court" unless the court finds the agreement to be unconscionable. *Id.* § 502(b). Maintenance can be fixed-term, indefinite, or reviewable subject to other provisions of the Act. *Id.* § 504(b-4.5)(1)-(3).

¶ 108   The Act further provides that any previous "order for maintenance may be modified or terminated only upon a showing of a substantial change in circumstances[,]" which are delineated therein. *Id.* § 510(a-5). However, termination of maintenance, based on cohabitation, is addressed specifically in section 510(c), where any "obligation to pay future maintenance is terminated upon

the death of either party, or the remarriage of the party receiving maintenance, *or if the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis*." (Emphasis added.) *Id.* § 510(c). "An obligor's obligation to pay maintenance or unallocated maintenance terminates by operation of law on the date the obligee remarries or the date the court finds cohabitation began," with the obligor "entitled to reimbursement for all maintenance paid from that date forward." *Id.*

¶ 109   Section 510(c) is not an attempt to control public morals. *In re Marriage of Bramson*, 83 Ill. App. 3d 657, 663 (1980). Rather,

> "[t]he purpose underlying the statutory termination of maintenance when the recipient spouse cohabits with a third party[,] is to remedy the inequity created when the recipient spouse becomes involved in a husband-wife relationship but does not formalize the relationship, so that he or she can continue to receive maintenance from his or her ex-spouse." *In re Marriage of Sunday*, 354 Ill. App. 3d 184, 189 (2004).

See *Miller*, 2015 IL App (2d) 140530, ¶ 40 (" ' "Where the relationship has achieved a permanence sufficient for the trial court to conclude that it has become a substitute for marriage, equitable principles warrant a conclusion that the spouse has abandoned his or her rights to support from the prior marriage ***." ' " (quoting *In re Marriage of Weisbruch*, 304 Ill. App. 3d 99, 105 (1999), quoting *In re Marriage of Herzog*, 761 S.W.2d 267, 268 (Mo. Ct. App. 1988))).

¶ 110   C. Cohabitating On A Resident, Continuing Conjugal Basis or "De Facto" Marriage

¶ 111   In determining whether a party is engaged in a "resident, continuing conjugal" relationship, as delineated within section 510(c), the party moving to terminate maintenance must show that the recipient is in a *de facto* relationship with a third party or, put another away, cohabiting with someone. *Sunday*, 354 Ill. App. 3d at 188-89; see *In re Marriage of Roofe*, 122 Ill. App. 3d 56, 59

(1984) ("[C]ourts have construed 'cohabitation' to mean a *de facto* husband-wife relationship."); see also *In re Marriage of Clark*, 111 Ill. App. 3d 960, 961 (1983) (In interpreting the Act, "courts of this State have held that a *de facto* husband-wife relationship must be shown in order to demonstrate cohabitation."). If the moving party meets their burden, the maintenance recipient must then demonstrate that he or she is not engaged in that type of relationship. *Herrin*, 262 Ill. App. 3d at 576.

¶ 112    Given that determining whether a relationship amounts to a *de facto* marriage is generally a question of fact, Illinois appellate courts have recently begun utilizing a nonexhaustive factor test to determine whether such a relationship exists, which is said to have "originated" from the Fourth District case of *In re Marriage of Herrin*, 262 Ill. App. 3d 573. See *Miller*, 2015 IL App (2d) 140530, ¶ 40; *Sunday*, 354 Ill. App. 3d at 189. Such factors include: "(1) its length; (2) the amount of time [the couple] spend[s] together; (3) the nature of the activities they engaged in; (4) the interrelation of their personal affairs; (5) their vacationing together; and (6) their spending holidays together." *Herrin*, 262 Ill. App. 3d at 577; see *Sunday*, 354 Ill. App. 3d at 189. These factors have seemingly been adopted, "without discussion, as though the factors were sufficient to encapsulate the totality of the circumstances in all cases." *Miller*, 2015 IL App (2d) 140530, ¶ 47.

¶ 113    However, it does not appear that our supreme court has "adopted the six-factor analysis in any manner, let alone adopted it as sufficient." *Id.* Further, over time, our courts have also questioned the saliency of various aspects of the six-factor test. See *id.* ¶¶ 48-49 ("A fair reading of *Herrin* leads us to the conclusion that, while helpful in most instances, the six-factor analysis was never intended to be used as *the* test to find a *de facto* marriage." If it were, "a more careful effort should be made as to its wording." (Emphasis in original.)). For example, some courts have criticized whether the *Herrin* factors sufficiently capture all aspects of a life partnership, with some

districts suggesting that the factors "focus greatly on the emotional and social components of a relationship[,] as opposed to practical and financial aspects that life partners share." *Id.* ¶ 48; see *Weisbruch*, 304 Ill. App. 3d at 104 ("[I]t is the financial implications of the relationship that are most relevant to determining the need for maintenance," with "[t]he most important factor [being] whether the cohabitation affects the receiving spouse's need for support."). Additionally, courts have observed that the six-factor test fails to articulate a "key emotional factor that is likely present in any *de facto* marriage: intended permanence and/or *mutual* commitment to the relationship." (Emphasis in original.) *Miller*, 2015 IL App (2d) 140530, ¶ 48.

¶ 114 As noted by the trial court in its order, there also has been discussion of when an "intimate dating relationship" rises to the level of a *de facto* marriage as contemplated by the statute. See *id.* ¶¶ 51-61. As recently discussed by one court:

"In distinguishing an intimate dating relationship *** from a marriage-like relationship ***, we think it fair to state the following. Intimate dating relationships have companionship and exclusive intimacy, whereas marriage-like relationships, while likewise having companionship and exclusive intimacy (not necessarily sexual but such that the former spouse does not engage in a similar relationship with a third person), also have a deeper level of commitment, intended permanence, and, unless reasonably explained, financial or material partnership (which would most commonly come in the form of a shared household)." *Id.* ¶ 61.

¶ 115 Indeed, even our supreme court has indicated that a finding of an intimate dating relationship does not necessarily equate to the conclusion that the relationship is resident, continuing, and conjugal, as required by statute. See *In re Marriage of Bates*, 212 Ill. 2d 489, 524 (2004) (spending time together with "sporadic" overnight stays does not establish a husband-and-

wife-like relationship where individuals did not live in the same residence, did not share finances, and did not take vacations together); see also *In re Marriage of Johnson*, 215 Ill. App. 3d 174, 180-81 (1991) (reversing termination of maintenance when, "[a]t most, the evidence may support a dating relationship"). In that same vein, however, our supreme court has also noted that a conjugal relationship may be found even when sexual relations have not occurred. See *In re Marriage of Sappington*, 106 Ill. 2d 456, 467-68 (1985); see also *In re Marriage of Aspan*, 2021 IL App (3d) 190144, ¶ 15 ("Illinois courts no longer require 'proof of sexual conduct,' so long as the party seeking termination can establish 'facts which would lead a reasonable observer to believe that the individuals were [living as] husband and wife.' " (quoting *In re Marriage of Lambdin*, 245 Ill. App. 3d 797, 801 (1993))).

¶ 116   Finally, although not explored by either party here, we are also mindful that, prior to the more formalized use of the six-factor *Herrin* test, many of our earlier appellate decisions placed much emphasis on whether the facts of each case expressly met the three statutory requirements of section 510(c)—namely, whether a cohabiting relationship was "resident," "continuing," and "conjugal" in nature.[11] For instance, in discussing whether a "conjugal" relationship must include sexual relations, our supreme court in *Sappington* stated that the term "cohabitation" meant "living or dwelling together," while "conjugal" is to be interpreted as "[o]f or belonging to marriage or the married state." (Internal quotation marks omitted.) *Sappington*, 106 Ill. 2d at 462-64.

¶ 117   However, many of our earlier decisions appeared to oscillate between declining to terminate or terminating maintenance based on whether the relationship is *either* conjugal,

---

[11]We note this primarily because our review of the record shows that Richard's petition solely alleged that Julee and Curt were engaged in a "continuing conjugal relationship" and not whether it was also "resident." However, based on our interpretation of section 510(c), we do not see Richard's failure to delineate all three statutory requirements in his petition as fatal to his appeal. Nevertheless, even if it were, our ultimate conclusion would still remain the same.

continuing, or resident. See *Johnson*, 215 Ill. App. 3d at 180-81 (reversing trial court's finding of a conjugal, continuing relationship, where appellate court held that ex-wife was not a "resident" under the Act simply by occasionally staying at new partner's home); see also *In re Marriage of Frasco*, 265 Ill. App. 3d 171, 176-77 (1994) (even after partner moved out of shared home with maintenance recipient, and technically was not a "resident," the court still found evidence of *de facto* marriage). Thus, it appears that the body of law has now shifted away from those pure statutory definitions and has now focused on whether a relationship is "husband-and-wife-like" in nature, *i.e.* one of a *de facto* marriage, based on the totality of the circumstances. See *Sappington*, 106 Ill. 2d at 467; see also *Miller*, 2015 IL App (2d) 140530, ¶ 2 (noting that "the *absence* of certain traditional components of a marital relationship, such as intended permanence and mutual commitment (speaking to the *continuing* and *conjugal* elements), a shared day-to-day existence (speaking to the *conjugal* and *residential* elements), and the shared use and maintenance of material resources (speaking to the *residential* element)" may be detrimental to a petition to terminate maintenance (emphases added)). This is reasonable because, although a given relationship may be short in duration or the couple may not live together at the time of trial, it may nonetheless still bear the hallmarks of a *de facto* marriage.

¶ 118   Thus, "[e]ach case seeking a termination of maintenance based on the recipient spouse's conjugal cohabitation rests on its own unique set of facts[,]" with an eye towards preserving the trial court's primary position in assessing those unique facts. *Sunday*, 354 Ill. App. 3d at 189. Although a "consideration of the nonexhaustive list of six common-law [*Herrin*] factors is helpful to any termination analysis, courts should not take a checklist approach wherein they merely note the presence of certain facts that fit into each category." (Emphasis omitted.) *Miller*, 2015 IL Ap (2d) 140530, ¶ 68. Instead, courts must be conscious of the fact that "many of the six factors can

be present in an intimate dating relationship as well as a *de facto* marriage." *Id.* Accordingly, with these principles and considerations in mind, we turn to the evidence in the record and the trial court's extensive findings.

¶ 119                                    D. Richard's Petition

¶ 120   Both Richard and Julee agree that the six-factor test articulated in *Herrin* was properly utilized by the trial court. Where the parties disagree is the weight given by the court to such factors in reaching its ultimate determination that, although the evidence showed that Curt and Julee had an intimate dating relationship, the evidence did not rise to that of a *de facto* marriage.[12] Ultimately, after our review of the record and the trial court's detailed findings, we do not find that the trial court's overall conclusion was against the manifest weight of the evidence.

¶ 121                                    1. *The Length of the Relationship*

¶ 122   Richard argues that the trial court "concede[d]" that the "duration" of Curt and Julee's relationship was that of a married couple. Julee disagrees, pointing out that the trial court noted that, although the duration and nature of the relationship was "deeply rooted" with many "earmarks" of a married couple, it nonetheless found that the relationship lacked the depth of commitment present in a *de facto* marriage. Julee's position on this point is rooted in the court's analysis of the other *Herrin* factors, where admittedly, even though the couple had been together for at least four years, other aspects of their relationship were not of such a nature to be a *de facto* marriage.

---

[12]We note in passing that, despite the parties' agreement that the six-factor *Herrin* test is helpful in analyzing whether Curt and Julee were in a *de facto* marriage, both parties failed to adhere to their own framework by arguing various facts or evidence against seemingly unrelated factors. We have attempted to separate the parties' arguments into the category of factors we believe best suited to address those arguments. But it would seem that having the structure of six specific categories would have aided both in better organizing their briefs for our review.

¶ 123   We turn to the court's findings. In its order, the trial court observed that, at the time of hearing, Curt and Julee had been dating for about four and a half years but had never been engaged. The court noted Julee's testimony that she and Curt had dated exclusively since 2017, but that their schedules had not allowed enough time together to consider marriage and that Julee was not interested in it at the time. Nevertheless, both considered themselves to be a couple, with Julee calling Curt her "companion" and Curt referring to her as his "best friend."

¶ 124   The trial court weighed this testimony against that of Isabelle and Thomas. Isabelle testified that Julee did not want to marry Curt for multiple reasons, including that he was too "emotional" and that she did not want to lose her maintenance payments. Thomas also testified that Julee had told him that she loved Curt but did not want to marry him because she did not want to lose her maintenance payments, which could affect her keeping her house. Finally, the court observed that Thomas testified that Julee believed she deserved the maintenance payments "based upon everything she did during the marriage." Ultimately, the court opined that, "on the surface, the duration of the relationship *** suggest[ed] a deeply rooted relationship" and that the evidence showed that Julee had been engaged in a long-term relationship with Curt.

¶ 125   We agree with the trial court that solely based on the *length* of time together, and without consideration of the other relevant *Herrin* factors, a four-and-a-half-year relationship partly suggests evidence of a *de facto* marriage. Although there was testimony from Curt that he and Julee had separated for about four to six months after they had been together for about a year, there was also testimony that Julee had never lived with another man after her divorce and had always been exclusively involved with Curt. Moreover, courts have found the existence of a *de facto* marriage, based on similar timelines when viewed in conjunction with other pillars of the relationship. See *In re Marriage of Walther*, 2018 IL App (3d) 170289, ¶ 27 (appearance of

*de facto* marriage based on at least two years' involvement and eleven months' exclusivity); see also *In re Marriage of Susan*, 367 Ill. App. 3d 926, 930 (2006) (finding of *de facto* marriage where couple had been together for three years); *In re Marriage of Snow*, 322 Ill. App. 3d 953, 956 (2001) (continual, conjugal relationship where couple was together for 1.5 years, even after third party moved out of the residence). Accordingly, this factor weighs in favor of a finding of a *de facto* marriage. However, as our further analysis will demonstrate, the length of the couple's relationship carries less weight based on other relevant factors.

¶ 126                              2. *The Amount of Time Spent Together*

¶ 127  Richard argues that the evidence demonstrated that when Curt was not working, he was at Julee's house, and thus, the two were spending a fair amount of time together. Richard takes issue with the trial court's "confusing" and "contradictory" discussion of this factor that, according to Richard, oscillated between economic considerations regarding Curt's residence and its attempt to resolve conflicting testimony regarding the amount of time Curt spent at Julee's home. In Richard's view, the court seemed to suggest that it was also Richard's burden to demonstrate that Curt's maintaining of his own home was a "sham" in order to avoid termination of Julee's maintenance payments.

¶ 128  Julee responds that the trial court properly evaluated the evidence as to this factor, including when it noted that the evidence was disputed. Julee contends that there are no such contradictory findings and that the court expressly found that it was "probably truer than not" that Curt and Julee spent a considerable amount of weekend time together. Nevertheless, Julee points out, the court was correct in not finding this factor ultimately dispositive. Finally, Julee argues that Richard's concern as to Curt's residence is unfounded.

¶ 129    We turn to the court's findings on this factor. As noted by the parties, the trial court observed that the amount of time Julee and Curt spent together was "hotly contested" based on the differences in testimony from Isabelle and Julee, specifically, with regard to the amount of time Curt stayed overnight at the residence. According to Isabelle, although the couple did not spend a great deal of time together in the beginning of their relationship, by summer 2018, Curt was "around a lot more" and was often spending nights at Julee's house. Isabelle further testified that it was "common" for Curt to "regularly stay overnight" at least every other weekend. However, the trial court acknowledged that Isabelle moved out of Julee's home during the course of the relationship, with the exception being the week or two she stayed to recover from shoulder surgery, and thus had "less opportunity to observe the frequency of [Curt]'s overnight stays[.]" Further, Isabelle also admitted that Curt worked a lot and would be out of town most weekdays.

¶ 130    In contrast, the trial court observed that Julee denied Isabelle's recollection of Curt's presence in the home. The trial court noted that Julee and Curt's testimony was consistent in that the couple began spending more time together in mid-2018, but Curt testified that he was out of town about 90% of the time, mostly on weeknights, and estimated his actual time at home to be about six days a month. Curt also stated that he would still return to his own residence unless he had been consuming alcohol that night. Similarly, Julee testified that the time Curt spent at her house was far less and that when he was home, they were probably together half of the time, and they were not together every weekend. Ultimately, the court determined that Julee and Curt saw each other frequently, that it was "more probably true than not" that the two spent a considerable amount of their weekend free time together, and that when Curt was in town, he was at Julee's home. Nevertheless, the court declined to find the time spent together as solely dispositive on the issue of cohabitation.

¶ 131    After reviewing the record, we also agree with the trial court. The evidence shows that Julee and Curt spent a significant amount of time together *when able to*, given Curt's mostly out-of-town job schedule. We acknowledge that the amount of time spent together will ultimately impact the analysis of the other *Herrin* factors, such as the nature of the activities spent during that time together or the holidays or vacations the couple spent together. Indeed, the trial court noted that the couple was together enough to engage in certain activities with each other, despite the limited time frame they had based on Curt's work schedule.

¶ 132    However, there is also evidence that Julee did not believe that she and Curt had spent enough time together for her to consider marriage, which the court found to be credible. Even accepting Isabelle's testimony as true regarding the time spent together, it appears that Curt and Julee were only able to spend time together on the weekends and did not live a day-to-day life together that would be more reflective of a husband-and-wife-like relationship. *Cf. Herrin*, 262 Ill. App. 3d at 577 (finding of a *de facto* marriage where couple saw each other every day for two and a half years and spent most evenings together); *Aspan*, 2021 IL App (3d) 190144, ¶¶ 6, 20 (finding of *de facto* marriage where couple lived together); *Walther*, 2018 IL App (3d) 170289 ¶¶ 27-28, 33 (finding of *de facto* marriage where couple were together on a daily basis); *Susan*, 367 Ill. App. 3d at 930 (finding of *de facto* marriage where couple spent nearly every night together during relationship); *Sunday*, 354 Ill. App. 3d at 190-91 (evidence of frequent overnight stays was not dispositive for determining whether a *de facto* relationship exists).

¶ 133    As such, although we do agree that the evidence showed a significant amount of time spent together, we also agree with the trial court's observation that this factor alone is not sufficiently dispositive, given the circumstances of Curt's employment and the trial court's credibility

determinations. Accordingly, we conclude that this factor only slightly points to evidence of a *de facto* marriage.

¶ 134                    3. *The Nature of the Activities Engaged In*

¶ 135   Richard argues that the nature of Julee and Curt's relationship was also one that the trial court found to be akin to that of a married couple, and thus also points to the finding of a *de facto* marriage. In our review of the briefs, it does not appear that Julee expressly challenges Richard or the court's findings on the nature of the couple's relationship.

¶ 136   On this factor, the court observed that it was clear that the two were in a monogamous, romantic relationship. The two spent time alone at Julee's home, went to dinner on their own or with friends and family, and held themselves out as a couple in public and on social media. The court noted that the two "engage in same activities and events in which married couples typically participate" and were physically affectionate with each other. Curt also assisted Julee with chores and repairs around her home, as well as weekend business trips for her former wrestling gear job.

¶ 137   However, the court noted that there was also evidence that the couple continued to live completely separate lives, even within their activities together. For example, despite evidence of spending weekends with Julee, Curt did not have any belongings stored at her home, and she never stayed at his home due to her pet allergies. The court also pointed out that it never heard any testimony as to whether Julee or Curt assisted each other with living expenses, such as food. There was some testimony about Curt paying for meals at restaurants, but it was also said that Julee paid sometimes as well. Overall, the testimony was that both paid for their own expenses.

¶ 138   Further, the court stated that the two had never been engaged or ever exchanged rings and did not refer to each other as husband or wife, but instead as "companion," "good friend," "best friend," or "girlfriend," even on social media. Moreover, it was Julee's testimony that she did not

want to get married, which the court found credible in light of Isabelle's corroborating testimony, despite also acknowledging that she had indicated that she also did not want to get married because she would lose her maintenance payments. See *Miller*, 2015 IL App (2d) 140530, ¶ 67 (no finding of relationship where the parties had discussed marriage, but maintenance recipient did not want it and no other evidence demonstrated a desire to manifest a similar commitment).

¶ 139    On this point, we find the evidence to be more equivocal for a variety of reasons. First, socializing and eating together either in the home or in public have been found to be characteristic of *de facto* marriages. See *Herrin*, 262 Ill. App. 3d at 577 (finding of *de facto* marriage where there was evidence of eating together at maintenance recipient's home); *Sappington*, 106 Ill. 2d at 465-66 (socializing together indicative of *de facto* relationship); *In re Marriage of Arvin*, 184 Ill. App. 3d 644, 647, 650 (1989) (no *de facto* relationship where couple only occasionally went out socially together); *Snow*, 322 Ill. App. 3d at 956 (*de facto* relationship where couple socialized together frequently and engaged in "dating activities" such as dinners, movies, and drinks); *Frasco*, 265 Ill. App. 3d at 176 (finding of *de facto* relationship where couple took meals together); *In re Marriage of Nolen*, 200 Ill. App. 3d 1072, 1075-76 (1990) (no finding of *de facto* relationship where pair infrequently socialized).

¶ 140    We have also found evidence of a *de facto* marriage where the record demonstrates shared household chores, ranging from laundry to cooking to maintenance work. See *In re Marriage of Toole*, 273 Ill. App. 3d 607, 612 (1995) (sharing of chores may be evidence of *de facto* relationship); *Miller*, 2015 IL App (2d) 140530, ¶¶ 44, 69 (no *de facto* relationship where the parties did not share a household or perform household duties together); *Lambdin*, 245 Ill. App. 3d at 804 (no *de facto* relationship where maintenance recipient did not do her partner's laundry); *Arvin*, 184 Ill. App. 3d at 650 (no *de facto* relationship where maintenance recipient did not do

laundry); *Snow*, 322 Ill. App. 3d at 956 (*de facto* relationship where couple split chores); *Frasco*, 265 Ill. App. 3d at 176 (finding of *de facto* marriage where relationship was akin to husband and wife, in that maintenance recipient acted as homemaker and partner did maintenance and yard work); *Walther*, 2018 IL App (3d) 170289, ¶¶ 28-29 (*de facto* relationship where maintenance recipient did household chores and prepped meals); *Roofe*, 122 Ill. App. 3d at 59-60 (maintenance recipient cooked meals at partner's home); *Bramson*, 83 Ill. App. 3d at 663 (no *de facto* relationship even with shared chores); *Schoenhard v. Schoenhard*, 74 Ill. App. 3d 296, 301 (1979) (no relationship where maintenance recipient lived with another man half the time and lived with her parents the other half, even though she performed chores for him and his children).

¶ 141   However, these considerations are balanced against the fact that Curt was generally only at the house when Julee was, as it was his testimony that he briefly had access to Julee's home when he and her brother were remodeling her basement, but that she changed the code thereafter and he otherwise could only enter the home when she left the door unlocked. *Cf. Sappington*, 106 Ill. 2d at 460 (partner had free access to maintenance recipient's home); *Walther*, 2018 IL App (3d) 170289, ¶ 29 (maintenance recipient had "unfettered access" to partner's home, even without a key).

¶ 142   There was also evidence on the record that the two spent a lot of time with members of both their families, where they presented themselves as a couple, which we discuss more extensively in consideration of the "interrelation of personal affairs" factor. See *Walther*, 2018 IL App (3d) 170289, ¶¶ 14, 29-30 (finding of *de facto* relationship where maintenance recipient maintained a good relationship with partner's daughter and engaged in multiple family activities); *Roofe*, 122 Ill. App. 3d at 60 (finding of *de facto* relationship where maintenance recipient's partner provided supervision and guidance to her daughter).

¶ 143   Finally, the record shows that Curt and Julee have shared a bedroom at her house, as well as on various vacations, such as Isabelle's wedding in Las Vegas. Courts have found that sharing a bedroom may point towards evidence of a *de facto* relationship. See *In re Support of Halford*, 70 Ill. App. 3d 609, 614 (1979); *Walther*, 2018 IL App (3d) 170289, ¶¶ 27-30; *Roofe*, 122 Ill. App. 3d at 60; *In re Marriage of Caradonna*, 197 Ill. App. 3d 155, 159-60 (1990). However, there was also testimony that, as of August 2021, Curt no longer sleeps in the same bedroom due to snoring issues, and the trial court noted that he did not believe there was any evidence of the parties changing their behaviors, including sleep patterns, following the filing of Richard's petition.

¶ 144   Ultimately, the trial court came to the conclusion that Julee and Curt's relationship was romantic and "clearly emotional, social and intimate." Thus, it implicitly found that the nature of their relationship, on balance, seemed to favor the finding of a *de facto* marriage. We agree that the evidence supports the court's assessment of Julee and Curt's relationship on this issue, and we find no error with the court's conclusion on this factor.

¶ 145        4. *The Interrelation of Personal Affairs*

¶ 146 Richard argues that the trial court improperly placed emphasis on the lack of interrelationship of the parties' finances and ignored other evidence relating to the couple's personal affairs, such as (1) Curt's active involvement in Julee's home maintenance, (2) both parties' involvement in each other's family events where they held themselves out as a couple, (3) Curt's listing in Julee's brother's obituary, (4) Julee borrowing Curt's car and allowing his son to live at her house, and (5) Curt being present at the hospital for Julee's medical episode. Further, even if the court properly placed more weight on the couple's financial relationship, Richard contends that the court ignored evidence such as Curt purchasing a washer, dryer, and television for Julee; his financial contribution to Isabelle's wedding; and Curt travelling with Julee to assist

with her wrestling gear business. Finally, Richard points to the fact that there was testimony indicating that Julee would not marry Curt due to her fear of losing her maintenance payments.

¶ 147 Julee responds that Richard's attempts to minimize the parties' lack of financial entanglement contradicts recent case law, which, according to her, emphasizes the importance of a couple's economic interrelation to determine whether a conjugal relationship exists. Julee argues that she and Curt did not have any intermingled finances or assets together, and, but for a single incident, Julee has never received any financial support from him. As to personal affairs, Julee emphasizes that the two have maintained fairly separate households.

¶ 148 As discussed above, the trial court emphasized that its consideration of the evidence on this factor was both personal and financial in nature. The court reiterated that it had to assess the "totality of the circumstances to determine whether the new relationship functions *practically and economically* in a marriage-like way and resist deciding *primarily upon emotional and social considerations*." (Emphasis added.)

¶ 149 With regard to personal affairs, the court acknowledged that the two had involved one another in their personal and social lives, with the record demonstrating both being present at many holidays and special events over the years. In contrast, however, the two had never been engaged, and Julee was not interested in marrying Curt at this time.[13] Further, the court also heard evidence that neither Julee nor Curt expected his name to be reflected on Julee's brother's obituary, with Julee even finding his inclusion to be "inappropriate," as he was in no way considered to be a family member.

_____

[13]In its order, the court considered some additional evidence under an "other" category, such as Curt's son's stay at Julee's house, as well as Curt's inclusion in Julee's brother's obituary. We consider the two under the "interrelation of personal affairs" factor instead.

¶ 150  With regard to the parties' financial relationship, the court found that the two had "completely and consistently maintained separate households and finances." The court observed that Curt had lived in a rental home in Caledonia, Illinois, for 10 to 12 years, which was far beyond the time he had begun dating Julee. He also lived there with his son, Gavin, and the rent and utilities were in his name. There was some testimony regarding Gavin's stay at Julee's home as being related to the fact that she had wi-fi there, which implicitly suggests that Curt's home did not, but that was unexplored by either party. Curt also never received mail at Julee's home and only received it at his rental. The court noted that, but for an article of clothing or tools, Curt did not have any furniture or other belongings at Julee's home, and when he did stay overnight, he would bring his own toiletries.

¶ 151  As to Julee's living arrangements, the court observed that she had lived with both her daughters at some point and currently lives with Angelina. Only Julee's name is on the deed and mortgage to her current residence, and she is solely responsible for her mortgage, utilities, and real estate taxes.

¶ 152  With regard to credit cards and other financial accounts, the court observed that the two did not share any and maintained their own. There was testimony that neither assisted each other with any of their bills or debts, with the exception being Curt's purchase of the washer, dryer, and television, which Julee repaid within a few months. Both of their life insurance policies listed their children as beneficiaries. However, the court appeared to imply that Julee likely saved some expenses by having Curt help her with projects around the home, including a major basement remodel, as well as work on her and her daughters' cars. The court also took into account testimony regarding Julee's reluctance to marry Curt, which was partly based on the potential loss of maintenance payments, although it did not find this to be persuasive to its overall conclusion.

¶ 153   Ultimately, the trial court concluded that, despite the length and nature of the relationship, "[o]n a practical and economic level," the two "could end their relationship and go their own way with virtually no effort whatsoever" because "financially, there [was] nothing to untangle[,]" "no assets or debts to divide[,]" "no deeds to quit claim[,]" "no titles to transfer[,]" and "no refinancing [] necessary." On this point, the court found *In re Marriage of Miller* persuasive, where there the parties, like Julee and Curt here, also had a long relationship, but were not contemplating marriage, did not share a residence, and did not comingle finances. As such, the trial court cited approvingly *Miller*'s conclusion that a "termination of maintenance must evince a permanence based on mutual commitment, as manifested by, for example, a combination of the length of the relationship, the intertwining of significant assets that would be difficult to undo, and/or verbal testimony of commitment[.]" See *Miller*, 2015 IL App (2d) 140530 ¶ 67.

¶ 154   It is clear that it was this factor that turned the tide on the court's assessment of the evidence. To begin, we emphasize the purpose of the fourth factor, which is distinct from analyzing a recipient's financial needs. As stated in *In re Marriage of Susan*, the fourth factor evaluates "not whether the new *de facto* spouse financially supports the recipient but, rather, whether their personal affairs, including financial matters, are commingled as those of a married couple would typically be." 367 Ill. App. 3d at 930-31; see *Frasco*, 265 Ill. App. 3d at 177-78. Thus, courts are to consider all aspects of the couple's life together, including financial, that might imply a husband-and-wife-like relationship.

¶ 155   The record demonstrates that Julee and Curt did not live together and that it was only Curt that stayed overnight, as Julee was allergic to Curt's cat. However, we acknowledge that Illinois courts have stated that a couple can still be found to cohabit even if they maintain separate households. See *Susan*, 367 Ill. App. 3d at 927-28, 930; *Herrin*, 262 Ill. App. 3d at 577-78. Further,

there was also evidence that two of Curt's sons at some point resided with Julee, albeit for short periods of time. Thus, the trial court's initial determination that Julee and Curt maintain separate households is not necessarily dispositive of their financial and personal affairs.

¶ 156    Nevertheless, we do not find the trial court's conclusion on this factor, and in particular its emphasis on the parties' lack of financial and commercial relationships, to be unreasonable. Our review reveals that the body of law interpreting this factor with regard to financial relationships is extensive. See *Sunday*, 354 Ill. App. 3d at 191-92 ("It is clear that this factor is very significant in determining the existence of a conjugal relationship" as our supreme court in "*Sappington* acknowledged that a conjugal relationship mimics the economic aspects of a marriage."); see also *Herrin*, 262 Ill. App. 3d at 577 (finding of conjugal relationship where partner utilized maintenance recipient's phone number for his business, partner borrowed money from maintenance recipient, and maintenance recipient took out loans for partner in order to pay for a computer and a car and to help pay partner's child support obligations); *Lambdin*, 245 Ill. App. 3d at 804 (no relationship where parties did not share real estate, personal property, or bank accounts); *Toole*, 273 Ill. App. 3d at 612 (relationship found where parties shared bank and credit accounts); *Johnson*, 215 Ill. App. 3d at 181-82 (no relationship where parties did not share expenses and third party did not take on maintenance recipient's other expenses); *Aspan*, 2021 IL App (3d) 190144, ¶¶ 17, 20 (relationship found where parties pooled resources and intermingled finances); *Walther*, 2018 IL App (3d) 170289, ¶¶ 28-29 (relationship found where maintenance recipient cashed checks for her partner's business, despite not intermingling other finances); *Caradonna*, 197 Ill. App. 3d at 160 (no relationship where maintenance recipient paid her own expenses, shared no personal accounts with new partner, and did not comingle funds); *Susan*, 367 Ill. App. 3d at 930 (parties did not comingle funds but evidence still pointed to a *de facto* marriage).

¶ 157   Courts have also taken into account whether parties have *formally* integrated the new relationship into their future endeavors. See *Weisbruch*, 304 Ill. App. 3d at 108 (finding of relationship where third party was named as beneficiary on maintenance recipient's will, deferred compensation and retirement plan, and life insurance policies); see also *Bramson*, 83 Ill. App. 3d at 663 (no relationship where third party received mail at another address and had identification cards with multiple addresses on them); see also *Sappington*, 106 Ill. 2d at 460 (third party had the newspaper delivered to the maintenance recipient's household).

¶ 158   In contrast, the occasional payment of a bill or utility, evidence of a loan, or even one shared nonfinancial account, has not been sufficient to rise to a *de facto* marriage against the other circumstances of the relationship. See *Sunday*, 354 Ill. App. 3d at 191 (no relationship where parties did not comingle funds, did not pay for each other's expenses, but third party would occasionally pay for food and gas when he used maintenance recipient's resources); *Arvin*, 184 Ill. App. 3d at 649-50 (payment of oil bill insufficient to find *de facto* marriage where no other household expenses were shared, no joint checking account, and no other comingling of funds); *Miller*, 2015 IL App (2d) 140530, ¶¶ 62-63 (parties shared a joint golf membership, but no *de facto* relationship where parties otherwise did not comingle finances and did not share household duties); *In re Marriage of Leming*, 227 Ill. App. 3d 154, 158, 161 (1992) (although maintenance recipient paid utilities and rent, couple otherwise did not comingle funds and maintained separate expenses); *Schoenhard*, 74 Ill. App. 3d at 301 (no relationship where, despite new partner loaning maintenance recipient money, she otherwise paid her own expenses).

¶ 159   In considering the gravity of this factor, as we noted initially, we find the Second District's discussion in *In re Marriage of Miller* to be helpful:

"In distinguishing an intimate dating relationship *** from a marriage-like relationship *** we think it fair to state the following. Intimate dating relationships have companionship and exclusive intimacy, whereas marriage-like relationships, *while likewise having companionship and exclusive intimacy* (not necessarily sexual but such that the former spouse does not engage in a similar relationship with a third person), *also have a deeper level of commitment, intended permanence, and, unless reasonably explained, financial or material partnership (which would most likely come in the form of a shared household*)." (Emphases added.) 2015 IL App (2d) 140530, ¶ 61.

¶ 160    The *Miller* court pointed to language utilized by our supreme court and in recent appellate court decisions that highlighted such characteristics of permanence—*i.e.*, planning to be together permanently and retiring with a new partner, designating the new partner as one's health care power of attorney, and naming her new partner as beneficiary over her will, rather than her children—and partnership, such as "join[ing] forces to run a single household, comingl[ing] funds and goods, and, at a minimum, look[ing] to one another for financial and material support." (Emphasis omitted.) *Id.* In the end, the *Miller* court reasoned that "companionship and exclusive intimacy" were not enough to carry the day against a lack of evidence relating to formal commitment and partnership ventures. *Id.* ¶¶ 62-63.

¶ 161    We find this reasoning persuasive, and, thus, we do not find error in the trial court's ultimate conclusion regarding Julee and Curt's personal and financial affairs. The court gave proper credence to the fact that on a social and emotional level, Julee and Curt had begun to integrate their lives with the time they had together. However, when assessing the more "practical and economical" hallmarks of a husband-and-wife-like relationship, including showings of commitment and mutual permanence, we agree with the court that the partnership is lacking.

¶ 162   We first take notice that, per Curt's testimony, the two had already separated once during the course of their relationship, albeit seemingly in the beginning. To the trial court's point that the couple's lives were so "neatly separated that they could end their relationship and go their own separate ways with nothing more than a final phone call or perhaps a text," this event demonstrates that such a separation had already occurred and there was no such testimony as to how that separation affected either of their lives. However, based on the record, we can presume that neither party's home life or finances were affected, nor were their relationships with their family members.

¶ 163   Julee also expressly indicated that marriage was not currently in her plans, based on the lack of quality time she and Curt have spent together, and although the evidence shows that the two try to be together when they can, there is no evidence of a true life spent together where the two actively involve themselves with each other's financial and future plans. We acknowledge that there is certainly evidence on the record that the two cook together and that Curt assisted her with maintenance work and on some business travels when he is able to. However, in their day-to-day existence, their individual lives are very much separate.

¶ 164   We also do not find Richard's contention regarding the "sham" of Curt maintaining his residence to be persuasive, and we also reject the notion that the trial court was seeking to add an additional burden for him to meet on his petition. Rather, it is clear that the case law suggests that courts may take into account whether one party maintained a separate residence but find that the party was sufficiently intermingled both personally and financially in the new relationship to render the keeping of the other home a sham. See *Roofe*, 122 Ill. App. 3d at 59 (relationship found where maintenance recipient kept her initial residence but rented it out to her daughter who took out utilities in her name and moved her furniture into her partner's residence and contributed to half the mortgage); *Herrin*, 262 Ill. App. 3d at 575 (noting that third party owned another residence

for four years, but the home did not have gas, water or heat). Here, the evidence shows that Curt has maintained his residence far beyond the time in which he began dating Julee and that his son Gavin, who for some time Curt was financially responsible for, began living with him about four years prior. Although his lease is month-to-month and Gavin spent some time at Julee's house for what appears to be a practical purpose, Curt is responsible for all such utilities and clearly maintains a residence in which himself and another person reside. See *Sunday*, 354 Ill. App. 3d at 190 (noting no evidence of abandonment of residence to live with partner).

¶ 165   Accordingly, we find the trial court's assessment of the evidence on this factor to be well-reasoned, not arbitrary, and grounded in the record before it. We also believe that many of the other *Herrin* factors sufficiently take into account various aspects of the couple's personal affairs other than financial, and thus this factor was adequately considered as a whole. We agree with the court that this was indeed a close call with "lots of gray areas to address," but given the trial court's primary role in assessing the evidence and witnesses before it, we agree that this factor counsels against the finding of a *de facto* marriage.

¶ 166                              5. *Whether They Vacation Together*

¶ 167   Richard argues that the record demonstrates that Curt and Julee always traveled together as a couple, notwithstanding whether such trips were for business or leisure, and that there was no evidence that they ever travelled separately. Richard also contends that the trial court erred by considering business trips as trips taken together, when it was more accurately suited to evaluating the interrelationship of their personal affairs. Last, Richard points out that the court did not consider trips to South Dakota or Indiana and, thus, failed to properly consider all the evidence related to this factor.

¶ 168   Julee points out that the trial court concluded that Julee and Curt's testimony regarding vacations was credible and should be given deference. Further, according to her, the court also considered social trips taken together, including time that initially started as a business trip in South Dakota and then became personal in nature when the two visited Mount Rushmore.

¶ 169   On this factor, similarly to the amount of time spent together, the trial court noted that the evidence regarding joint vacations was disputed. Most of the testimony concerned Julee's business trips, which occurred prior to the COVID-19 pandemic. The evidence showed that Curt would occasionally travel with Julee on the weekends to assist her on long business trips for the wrestling apparel business she operated for about a year. Such trips included South Dakota, West Virginia, Michigan, Arkansas, and Missouri. He would also sometimes assist her on more local trips within two hours of her home. Julee covered all the business expenses on the trip, including lodging and gas, but the pair split meals. Julee testified that Curt helped her with driving because she was unable to travel long distances, as her vision at night was poor, which was confirmed by Isabelle's testimony. Curt also helped Julee with setting up her presentations and assisting with the sale of merchandise.

¶ 170   With regard to leisure trips, the court noted that both Julee and Curt considered the Florida trip as such, although both stated that Curt had originally intended to take this trip with his mother, despite it being on Julee's fiftieth birthday. Julee also admitted that she did not pay for the vacation, but the record demonstrated that she and Curt stayed at a family member's home for the trip in exchange for maintenance work. Further, at least one of the business trips to South Dakota included a stop at Mount Rushmore.

¶ 171   The trial court acknowledged that, overall, Curt and Julee travelled together numerous times and found that the pair had taken at least two trips together for leisure purposes, specifically

to Florida and Mount Rushmore. However, it found Julee and Curt's testimony regarding their trips together to otherwise be credible, in that most of their time together had been for business-related purposes. Our review of the record also shows that Julee traveled to visit Curt at least once in Indiana for an overnight trip, while he was on a location for work, which appears to be somewhat in the middle of being considered a leisure or business trip.

¶ 172   We note that the court did not make an express finding as to this factor, but we interpret its findings on this issue to be related to its conclusion regarding the nature of the relationship and time spent together and, thus, was relatively equivocal. Case law suggests that evidence of *multiple* vacations taken together may lean towards the finding of a *de facto* relationship, even when it includes business trips. See *In re Marriage of Andres*, 2021 IL App (2d) 191146, ¶¶ 15, 22 (trial court found evidence of cohabitation where maintenance recipient and third party travelled together for business and leisure); *Herrin*, 262 Ill. App. 3d at 577 (*de facto* relationship where parties took vacations together); *Sunday*, 354 Ill. App. 3d at 192-93 (reversing trial court's finding of a conjugal relationship where, among other bases, evidence showed that the parties did not take vacations together); *Lambdin*, 245 Ill. App. 3d at 804 (no relationship where parties did not take vacations together); *Sappington*, 106 Ill. 2d at 466 (evidence of vacations together established sufficient relationship); *Aspan*, 2021 IL App (3d) 190144, ¶¶ 10-11, 18, 20 (same); *Frasco*, 265 Ill. App. 3d at 176 (same); *Walther*, 2018 IL App (3d) 170289, ¶¶ 29, 31 (*de facto* relationship established where evidence of short trips were taken together); *Susan*, 367 Ill. App. 3d at 930 (evidence of many trips established a *de facto* marriage); *Nolen*, 200 Ill. App. 3d at 1075 (no relationship where parties did not travel together unless by necessity); but see *Rosche v. Rosche*, 163 Ill. App. 3d 308, 313-314 (1987) (no relationship, even though parties took trips together).

¶ 173  Here, the record indicates multiple trips, but most were business-related because Julee, as confirmed by her daughter and Curt's testimony, had issues with driving long distances and at night. Further, Curt would not usually accompany Julee on shorter, more local trips, and there was testimony that she had also travelled on one of these trips with one of her daughter's ex-boyfriends. One of Julee's leisure trips was taken to Curt's jobsite, and the Mount Rushmore trip was incidental to her business trip. Thus, the evidence shows that only one other joint leisure trip was taken over the course of four or so years. This may be explained by Curt's work schedule, where he was likely only able to accompany Julee on her business trips because they occurred on the weekends. As such, we agree with the trial court's implicit finding that although the two are said to have spent a good amount of time together, which encompassed such trips, this factor is not necessarily compelling in establishing a *de facto* marriage. Accordingly, we do not find any error.

¶ 174                    6. *Whether They Spend Holidays Together*

¶ 175  Finally, as to holidays, Richard contends that the court erred in giving little weight to this factor. Richard argues that the record demonstrates that "the level of commitment" between Julee and Curt was "so significant, that they do not spend holidays apart." Specifically, Richard points to Isabelle's testimony that the two spent "all holidays over the past several years" together, primarily at Julee's home, which Richard equates to that of a married couple. On this point, it does not appear that Julee challenges any specific argument on this issue, but generally argues that the trial court did take into account the fact that the couple spent numerous holidays and events together and yet, still concluded based on the totality of the circumstances, that the evidence was insufficient to establish a *de facto* marriage.

¶ 176  In its order, the court considered evidence relating to holidays and special events spent together, and ultimately found that the two had shared "numerous" experiences both together and

with their immediate and extended families. Specifically, the court pointed to the following events: (1) May 2018, when Julee attended the high school graduation of Curt's son, Mason, (2) May 2019, when Julee attended Mason's induction ceremony into the United States Navy, (3) December 2019, when Julee was present for Mason's departure for service, and (4) Isabelle's wedding.

¶ 177   The court further acknowledged that there had been testimony concerning holidays that was "all over the board and difficult to follow," but, nevertheless, it was clear that the two had spent numerous holidays together, such as Easter, Memorial Day, Fourth of July, Thanksgiving, and Christmas, all of which were spent at Julee's residence. Depending on the year, different members of their families attended such events, including their own children. The court observed that it was also Isabelle's testimony that Curt had spent more holidays with them than he acknowledged on the stand and that every time they were all together, the comingled attendees "act[ed] like family."

¶ 178   With regard to Isabelle's wedding, the court observed that Julee and Curt had each covered their own expenses. Curt had also rented a vehicle and did not ride in the limousine with the bride and groom, whereas Julee and Richard did. However, Julee and Curt shared a hotel room, Curt attended most events and functions, and Curt appeared in many of the photographs throughout the weekend. Curt also gave Isabelle $800, which Isabelle considered a contribution to the cost of the wedding, while Curt considered it a gift. On this point, we also observe that it was Richard's testimony that the money was a gift from both Julee and Curt.

¶ 179   With regard to Mason's party, the court observed that in mid-February 2022, Julee and Curt co-hosted, but most of the attendees were Curt's relatives, excluding Julee's daughters and

son-in-law. Curt paid for most of the costs of the event, and Julee supplied the venue, soda, and water. Julee volunteered to host due to her allergies.

¶ 180 Similarly to the factor assessing vacations taken together, courts have found that the existence of a *de facto* marriage may be supported by evidence of a couple celebrating holidays and special events together. See *Herrin*, 262 Ill. App. 3d at 577 (*de facto* relationship may be found where holidays were spent together); *Toole*, 273 Ill. App. 3d at 612 (exchange of holiday and birthday gifts sufficient to satisfy factor); *Snow*, 322 Ill. App. 3d at 956 (exchange of gifts); *Frasco*, 265 Ill. App. 3d at 177 (exchange of gifts and shared holidays and events); *Walther*, 2018 IL App (3d) 170289, ¶ 32 (all major holidays spent together); *Susan*, 367 Ill. App. 3d at 927, 930 (same).

¶ 181 Ultimately, we think the court's conclusion that Julee and Curt had a social and emotional relationship also applies to its assessment of the two spending holidays together. A great deal of testimony was taken regarding how much time was spent together was during holidays, with Curt stating that he had holidays off from his job. There was testimony that some holidays were spent apart, but overall, the two did appear to be together on most major holidays and with members of their immediate and extended family. Interestingly, no real testimony was taken regarding each other's birthdays, beyond the fact that the Florida trip was taken around Julee's fiftieth, or regarding any gift exchanges on holidays and birthdays. However, there was testimony that Curt had contributed, either as assistance or as a gift, to Isabelle's wedding and that both Julee and Curt had also contributed as a couple.

¶ 182 However, just as the court found that taking vacations together was not necessarily dispositive of the finding of a *de facto* marriage, we also believe the same to be true here. In our view, this factor simply further demonstrates that, in the amount of time the two spent together, given that Curt had those dates off from work, they would spent time together during holidays and

that Julee and Curt presented themselves as a couple to the public.[14] At best, this evidence again goes to how the two spent their time when they were together, and only slightly suggests a finding of a *de facto* relationship.

¶ 183          E. Finding of Intimate Relationship, But Not a *De Facto* Marriage

¶ 184   The trial court's denial of Richard's petition rested on the fact that, based on the totality of the circumstances, Julee and Curt's relationship was more akin to an intimate dating relationship, rather than a *de facto* marriage. The court agreed that Richard had sufficiently established the social and emotional aspects of a long-term, romantic relationship that involved both parties' families. However, on balance, it determined that the relationship lacked certain practical and economic characteristics, specifically with regard to their otherwise separate lifestyles and financial situations, citing *In re Marriage of Miller* as persuasive to its conclusion. In doing so, the court gave less credence to the evidence concerning the amount of time spent together and what the couple did during that time, versus what they *did not do* during that same time, as telling of the true nature of the relationship.

¶ 185   Given the practical realities of our ever-evolving world and the uniqueness of each relationship assessed pursuant to this section of the Act, we do not find this conclusion to be unreasonable and actually anticipate such outcomes to become more common over time. Ultimately, our review of the trial court's decision is not based on whether we would come to the same conclusion as the court, but whether an "opposite conclusion is clearly evident" or if the decision is "unreasonable, arbitrary, or not based on the evidence." *Miller*, 2015 IL App (2d)

---

[14]Indeed, as noted by some courts, it would seem that the factors relating to "amount of time spent together," "nature of the relationship," "vacations," and "holidays" could very well be assessed together. See *Miller*, 2015 IL App (2d) 140530, ¶ 49.

140530, ¶ 40. We agree with the trial court that this was a close call and, thus, not clearly evident. We are also mindful that the trial court is in the best position to assess the evidence before it, and we cannot say that the court's ultimate and well-reasoned conclusion is not supported by the record. See *Lambdin*, 245 Ill. App. 3d at 804 ("Although there was sufficient evidence presented to grant the petition to terminate, there also was sufficient evidence to deny the petition."). As such, we do not find that the trial court's denial of the petition was against the manifest weight of the evidence and, thus, affirm.[15]

¶ 186                                    III. CONCLUSION

¶ 187   For the reasons stated, we affirm the trial court's denial of Richard's petition to terminate maintenance payments.

¶ 188   Affirmed.

---

[15]We note that, in Richard's request for relief, he also sought retroactive application to the termination of maintenance. Having determined that the trial court did not err in its denial of Richard's petition, we need not address this briefly mentioned request for relief.

*In re Marriage of Edson*, 2023 IL App (1st) 230236

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Boone County, No. 2016-D-4; the Hon. Ronald A. Barch, Judge, presiding. |
| **Attorneys for Appellant:** | Richard M. Butera, of Butera Law Offices, P.C., of Rockford, for appellant. |
| **Attorneys for Appellee:** | James T. Zuba, of Zuba & Associates, P.C., of Rockford, for appellee. |