2024 IL App (2d) 230212-U
No. 2-23-0212
Order filed April 24, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| In re MARRIAGE OF KATHLEEN MYERS, | ) | Appeal from the Circuit Court |
| | ) | of Kendall County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 21-D-12 |
| | ) | |
| STEVEN MYERS, | ) | Honorable |
| | ) | Joseph R. Voiland, |
| Respondent-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE McLAREN delivered the judgment of the court.
Justices Jorgensen and Kennedy concurred in the judgment.

**ORDER**

¶ 1    *Held*: Wife did not cohabit and lose the right to maintenance. Computation of maintenance and child support was properly based on an annuity as income. The failure to render a ruling on a petition was forfeited. Payments made to the parties with the understanding that they were not gifts were properly awarded to the grandparents. Seeking the award of an annuity as non-marital property was relief sought without a pleading, and the trial court's refusal to rule was not abuse of discretion. Affirmed.

¶ 2    Respondent, Steven Myers, challenges the trial court's award of indefinite maintenance to petitioner, Kathleen Myers; the calculation of the amount of maintenance; the failure to rule on his petition to reduce child support; the requirement to repay money given to the parties by Kathleen's

parents; and the failure to award the non-marital annuity to him. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     The parties were married in 1998, in Burbank, Illinois. Four children were born during the marriage. In January 2021, Kathleen filed a petition for dissolution of marriage, and Steven filed a counterpetition in February. Temporary child support and maintenance were set at $3,000 per month, based on the funds Steven received each month in unemployment compensation. In June 2021, Steven filed a petition to modify temporary maintenance and child support that was not heard before the commencement of the trial.

¶ 5     The case went to trial in September 2022. A judgment for dissolution of marriage was entered in March 2023. Steven's motion for reconsideration was denied, and this timely appeal followed.

¶ 6     Additional facts relevant to the issues on appeal are included in the Analysis section of this disposition.

¶ 7                                    II. ANALYSIS

¶ 8     At issue in this appeal is (1) whether the award of indefinite maintenance to Kathleen was against the manifest weight of the evidence because she was engaged in a *de facto* marriage with Paul Greet; (2) whether the award of maintenance and the calculation of the amount of maintenance payable to Kathleen were incorrect and against the manifest weight of the evidence and should be overturned; (3) whether the failure to rule on Steven's June 2021 petition to reduce child support based upon Kathleen's full-time employment and Steven's reduced unemployment income was against the manifest weight of the evidence or, at the very least, an abuse of discretion; (4) whether it was against the manifest weight of the evidence for the trial court to require

repayment of money given to the parties by Kathleen's parents; (5) whether it was an abuse of discretion to not award the non-marital annuity to Steven.

¶ 9                                    A. Cohabitation

¶ 10    In framing their cohabitation arguments, the parties rely primarily on two cases, *In Re Marriage of Miller,* 2015 IL App (2d) 140530, and *In Re Marriage of Edson,* 2023 IL App (1st) 230236. The *Miller* court lists factors for determining cohabitation, including that cohabitation is based on the totality of the circumstances and courts should consider its length, the amount of time the couple spent together, the nature of the activities they engaged in, the interrelation of their personal affairs, their vacationing together, and their spending holidays together. *Miller*, 2015 IL App(2d) 140530, ¶ 40 (citing *In re Marriage of Herrin,* 262 Ill. App.3d 573, 577 (1994)).

¶ 11    In *Edson*, when considering if the wife was in a *de facto* marriage, the court reasoned that the record was to be evaluated for signs of mutual commitment and permanence, as well as whether the "new relationship functions practically and economically like a marriage and, if not, whether [there] is a reasonable explanation [for that]." *Edson*, 2023 IL App (1st) 230236 ¶ 97. The court further stated that "[e]ach cohabitation case turns on its own set of facts; just as no two relationships are alike, no two cohabitation cases are alike." *Id*. In the case before it, the *Edson* court found that "[u]pon closer analysis the relationship lacks the depth of commitment necessary for the court to find a *de facto* marriage" and that "a deeper dive reveals something better described as an exclusive social companionship with occasional benefits, rather than a *de facto* marriage." *Id*. at ¶ 100.

¶ 12    Kathleen testified as follows. She spent nights with Paul in Madison, Wisconsin, a couple of nights each week between January 2019 and September 2020, and she took her children with her to spend the night at Paul's home during that same time period. In approximately November

of 2019, Paul moved from Madison to a location approximately five minutes away from Kathleen. After Steven moved out of the marital residence in September of 2020, Paul began staying overnight at the marital residence. Kathleen introduced Paul as her significant other and her partner and introduced Paul to her parents.

¶ 13    Paul, Kathleen and her children have spent two of the three past Thanksgiving holidays together at Kathleen's house and spent the last three Christmas holidays at Kathleen's house. Kathleen further testified that she and the children have all spent the night at Paul's house in Madison, and he spent the night "lots of times" at her house.

¶ 14    Kathleen further testified that Paul moved because he needed a new home; he had no family and the only person he was 'tied to' was Kathleen. Kathleen said that they discussed marriage. Paul helped clean out the marital residence after Steven moved out. Paul and Kathleen regularly took hiking day trips together with Kathleen and her children, and she testified that they took at least a dozen such family trips together. Paul left his cat to live with Kathleen, and Kathleen took care of the cat when it was ill.

¶ 15    Paul has cooked many meals for Kathleen and her children at his home; he has eaten meals with Kathleen and her children at her house, and he has cooked for Kathleen and her children at Kathleen's house. Paul tattooed Kathleen's name on his arm. Kathleen designed matching infinity tattoos which they both received. Paul tattooed Kathleen's nickname, "Bubbles," on his neck, and "Bubbles" was in Kathleen's handwriting. Kathleen considered Paul part of her family and testified that everyone she loves is a part of her family. Paul is very close to her children, and he attended two of her children's graduation ceremonies, cheer events, and the majority of the children's birthday celebrations. Kathleen, Paul and children also went to movies together. Kathleen posted on Facebook that they (she and the children) "love having you with us." She also

posted on Facebook that, during the Covid shut down, "it was wonderful to have a partner that will cook us some dinner. Thank you baby." During the Covid shut down, Kathleen also drove Paul to work because "he was the one person, when you weren't allowed to see anybody, I still gave him rides to work, so I had to see him." Kathleen has loaned Paul money to pay his rent, and Paul has deposited money directly into Kathleen's bank account.

¶ 16    Notably, Kathleen testified that in the summer of 2019, Paul was in the hospital in a coma, and she left her children in Illinois and spent the week with him at the hospital. Despite her assertions that Kathleen and Paul had broken up, Kathleen testified that Paul was still spending the night at her home and had done so the week before the trial commenced. Paul confirmed these facts when he testified that he stayed overnight at Kathleen's house the week prior to the start of trial, and stayed in the same room with her. He testified that when he does stay the night with Kathleen, they sleep in the same room.

¶ 17    Paul was served with the subpoena to testify at the trial at Kathleen's home. They also had dinner together the week before the trial started. Kathleen testified that they still go out together and Kathleen drove Paul to the trial to testify. Kathleen testified that she still loves Paul and, just a few days before the trial, she told Paul she loved him. Her children have told Paul they love him and have done so publicly by posting it on Facebook, where Paul has responded that he loved one of the children as well. Paul has referred to Kathleen as his other half. While Kathleen testified that she and Paul had allegedly broken up, she also testified that she did not want to date anyone else; she neither testified that she was dating anyone else at the time of trial, nor that she had dated anyone else.

¶ 18    Notwithstanding all of the above, there is evidence of record that supports the court's ultimate finding that Kathleen and Paul were *not* in a relationship that functions practically and

economically like a marriage, and there is a reasonable explanation for so finding. See *In re Marriage of Edson*, 2023 IL App (1st) 230236 ¶ 97.

¶ 19    The factor relating to the length of the relationship was contested by Kathleen. She testified that she and Paul had been "broken up for a long time" but "got together once in a while because I do not want to date anybody else." Her testimony further explains that she does not want to date anyone else "[b]ecause I'm going through all this" and that, although Paul is a nice person whose company she enjoys, they "don't work out as a couple." Although the length of the relationship may have covered three years, it was not ongoing or consistent. Giving deference to the court to weigh the evidence relating to this factor, the factor weighs in favor of Kathleen.

¶ 20    The second factor, the amount of time Kathleen and Paul spent together, was not clearly defined. They have separate residences, and they were not together for the majority of any week. This factor could support Steven's claim but there was other evidence, if believed, that would weigh in favor of Kathleen. Again, deferring to the court's prerogative to weigh the evidence, we determine this factor favors Kathleen.

¶ 21    The factor relating to the nature of activities is equivocal. The activities Kathleen and Paul engaged in, other than intimacy, was not so significant as to suggest a marital relationship. Although the family did hundreds of day trips focused on hiking Paul did not participate on a regular basis. Spending holidays and vacations were not so involved or common that they could only be characterized as marital commitments. It was claimed that Paul cooked often for the family however that was contested as to how often it occurred. Shared tasks, like chores and duties, were neither assigned nor assumed. There was much said about the tattooing of Kathleen and Paul, and the design of the tattoos. Although it suggests something about their relationship, tattooing has not yet been declared a significant factor, so as to be considered in a meaningful manner. There is

nothing that was uncontroverted regarding this factor that would make it significant one way or another.

¶ 22    The factor relating to the interrelationship of Kathleen's and Paul's personal affairs is a substantial factor, and it leans in favor of Kathleen. Neither individual merged nor intermingled their assets. The single loan of money for rent by Kathleen and the deposit (not withdrawal) by Paul of monies in Kathleen's personal accounts were not sufficient to establish that they were acting as if they were married. The parties lived separate and apart from each other, and they could go their separate ways financially. Despite their matching tattoos, there was no deep level of commitment, intended permanence, or a material partnership. See *In re Marriage of Miller*, 2015 IL App (2d) 140530, ¶ 61. The evidence for this factor is manifest that Kathleen was not cohabitating.

¶ 23    The penultimate factor is common vacations. Kathleen and Paul spent one overnight vacation in Indiana and shared the expenses. This singular event does not make this a significant factor supporting cohabitation.

¶ 24    The final factor of holiday sharing indicates that numerous holidays were spent by Paul with Kathleen and her family. However, this factor is tempered by the fact that Paul had no other ties to any other group that might wish to associate with Paul on the sundry holidays. Although this factor could lean in favor of a finding that there was a serious social relationship, we hold that it does not alter the totality of the circumstances and does not establish an abuse of discretion to grant indefinite maintenance.

¶ 25                                B. Amount of Maintenance

¶ 26    Steven claims that the amount of the maintenance is too much. We review the claim based upon whether the award is an abuse of discretion. See *In re Marriage of Brill*, 2017 IL App(2d)

¶ 26. Steven claims that his six-page exhibit 16 proves that Kathleen regularly receives and deposits unaccounted for money received from "her paramour, family and unknown sources." Steven fails to explain, however, what those unknown sources are, as there is no citation to the record to explain them. Steven argues, "[t]he fact that money regularly came from sources other than her employment does not mean that they should not be included in the calculation of maintenance." Nevertheless, it does not mean that they should be included. Without evidence of the nature and extent of these undefined deposits, we may not presume error and Steven has not established error.

¶ 27 Steven also makes references to things that were *not* testified to: for example, Kathleen failed to provide any testimony or evidence that she was under any impairment due to her devoting time to domestic duties or having forgone or delayed education, training, employment, or career opportunities due to the marriage, or that she was unable to work on a full-time basis. Kathleen also allegedly failed to provide any testimony or evidence that the effect of any parental responsibility arrangements prohibited her from working on a full-time basis. That may be true in the literal sense, but she also testified generally about those issues, and the record supports the trial court's implicit determination that Kathleen had limitations on full time employment and the capacity to earn sufficient funds because of her limited employment outside the home and the obligations of a custodial parent of minor children.

¶ 28 Steven continues his claim of error in the maintenance awarded by arguing that the monthly proceeds from the annuity he receives for a pre-marital injury should not be deemed income. Although he cites to several cases, he does not cite to the case relied upon by the court, *In Re Marriage of Dahm-Schell and Schell*, 2021 IL 126802, in determining that the proceeds should be counted for maintenance and child support. In his reply brief, Steven references the case but only

as regards Kathleen's unidentified deposits imputing income. It is curious that the case only applies to Kathleen and not to both parties.

¶ 29    In *Marriage of Dahm-Schell and Schell*, the supreme court answered a Rule 308 certified question, finding:

> "under the plain language of the Act, [husband's] receipt of the mandatory distributions and withdrawals from the inherited IRAs are included in the statutory definition of "income" for the purpose of calculating his support obligations. 750 ILCS 5/504(b-3), 505(a)(3) (West 2018); *LaSalle Bank National Ass'n* [*v. Cypress Creek 1, LP*], 242 Ill. 2d [231,] 237 [2011]; [*In re Marriage of*] *Rogers*, 213 Ill. 2d [129,] 137 [2004] (finding inclusion of gifts a father receives from his family as income is proper under the plain and ordinary language of section 505(a)(3)). Classifying the distributions and withdrawals as income does not constitute impermissible double counting because the inherited IRAs had not been previously imputed to [husband] as income for support purposes.)." *In re Marriage of Dahm-Schell and Schell,* 2021 IL 126802, ¶ 54.

The court also stated, " *'income' has the same meaning with regard to maintenance and child support*. Illinois reviewing courts have consistently held that this is a broad and expansive definition." (Emphasis added.) *Id*. at ¶ 39.

¶ 30    We agree with the trial court that a fair reading of *Dahm-Schell & Schell* would include the proceeds of the annuity as income for maintenance and support purposes. We agree with Kathleen that *Villanueva v. O'Gara*, 282 Ill. App.3 d 147, 152 (2d Dist. 1996), recognizes that settlement proceeds allocated to lost earnings (but not other earnings to make one whole) are properly includable as "income" for support purposes. Steven has failed to establish that the court's implicit finding that the payments are for lost earnings is against the manifest weight of the evidence.

¶ 31                    C. Failure to Rule on Petition to Reduce Support

¶ 32    Steven's third claim of error is the court's failure to rule on Steven's petition to reduce

child support. We determine that Steven has forfeited the claim. There is no citation to the record

to establish that the petition was heard, evidence was presented, and the court was fully advised in

the premises. Without such citations we ought not fault the court for not ruling on the petition let

alone determine that whatever it did was error.

> "A reviewing court is entitled to have issues clearly defined with pertinent authority
>
> cited and cohesive arguments presented (134 Ill.2d R. 341(e)(7)), and it is not a repository
>
> into which an appellant may foist the burden of argument and research (*Pecora v. Szabo*
>
> (1982), 109 Ill. App. 3d 824, 825–26); it is neither the function nor the obligation of this
>
> court to act as an advocate or search the record for error (*Mielke v. Condell Memorial*
>
> *Hospital* (1984), 124 Ill. App. 3d 42, 48–49). Accordingly, these contentions are waived."
>
> *Obert v. Saville*, 253 Ill. App. 3d 677, 682 (2d Dist. 1993).

¶ 33                    D. Repayment of Monies from Kathleen's Parents

¶ 34    Steven's penultimate claim of error is the court erred in requiring repayment of money

given to the parties and Kathleen by Kathleen's parents. In paragraph K of the Judgment the trial

court set forth the following:

> "During the trial of this matter, Carol Hamilton, the mother of Kathleen, testified
>
> that she and her husband loaned the parties money during the course of their marriage. In
>
> September of 2019, she loaned them approximately $34,000.00 of which $16,500.00 has
>
> been repaid, leaving a balance due of $18,562.30. She and her husband also loaned the
>
> parties money for payment for repairs, purchases of appliances, replacement of the HVAC
>
> system, school fees, and utility bills totaling $20,223.86. Although this court is wary of the

legitimacy of financial transactions between a party and a parent, this court is satisfied that the monies paid by the Hamiltons for debts and obligations of parties was done with the understanding that the monies would be repaid. Although Steven claims to never having agreed to repayment of the payments made by the Hamiltons, the evidence is overwhelming that he knew of the payments being made by Kathleen's parents, knew that partial repayment of the obligations had occurred and did not treat the payments as in the nature of a gift. Based upon the nature of the payments made (to avoid shutoff of utilities, replace broken appliances, and pay taxes), the court finds that such payments were necessary to prevent financial hardship to the parties. Steven cannot now assert non-responsibility of these obligation when he enjoyed the direct benefits of these payments at the time they were made. Accordingly, this court finds that there are outstanding loans to the Hamiltons totaling $38,786.16 to be allocated between the parties as part of this proceeding. The court allocates distribution of this debt equally between the parties. Kathleen shall be responsible for paying the entire debt and shall receive a credit totaling $19,393.08 from Steven's portion of the marital assets."

¶ 35 Steven claims the statute of frauds applies to preclude recovery. We determine that the transaction could be completed within a year and, therefore, is not covered by the statute. See *Hartbarger v. SCA Services, Inc*., 200 Ill. App. 3d 1000, 1016 (5th Dist. 1990) ("If *** it appears from a reasonable interpretation of the terms of the agreement that it is capable of performance within one year, the statute of frauds is inapplicable."); *In re Marriage of Strand*, 86 Ill. App. 3d 827, 831 (1st Dist. 1980) (when an agreement "could have been performed within a year[,] it does not come within the statute"). The statute of frauds notwithstanding, the trial court found Carol Hamilton and Kathleen credible, that the loans related to necessities that were acknowledged and

repaid in part, and that Steven received a benefit for which he ought to repay. For Steven to say there was no consideration for the expenditure of these monies fails to recognize the existence of those payments and the substantial benefits derived from such *consideration* constituting the loans. The trial court was wary of the transactions but awarded repayment because it was satisfied that these transactions were not gifts, the expectation of repayment was communicated, the parties received the benefit of the transactions, and the parties were not in a position to refuse repayment. Finally, both Kathleen and Steven were held equally liable, refuting the claim that Steven was bearing an unequal or unfair burden. The court's judgment was neither against the manifest weight of the evidence nor an abuse of discretion.

¶ 36                     E. Failure to Award the Annuity to Steven

¶ 37    Steven's last claim of error is the failure of the court to award the annuity to him as his premarital property. We are unaware of a pleading filed by Steven relating to the annuity's character, ownership or present status. The court in its findings related,

> "[Steven] receives a monthly annuity payment of $5,674.00 per month. No testimony was presented regarding ownership of the annuity, the designated beneficiaries of the annuity, when it was created, and whether it has any residual value to the parties. Absent such information, the court is only considering the monthly payment to Steven for purposes of determining child support and maintenance. The court finds that the monthly proceeds received by Steven constitutes income as contemplated under the provisions of sections 504 and 505 of the IMDMA. See *In Re Marriage of* [*Dahm-Schell and*] *Schell*, 2021 IL 126802. Based upon the foregoing, the court attributes to Steven gross monthly income totaling $8,022.67 per month."

¶ 38    We determine that under the circumstances stated by the court above, it was not required to award the annuity to any of the parties due to the failure to bring the issue before the court, and give the opposing party the opportunity to respond and the court the opportunity to consider the implications of such an award. The decisions of the courts in *In re Marriage of Britton*, 2022 IL App(5th) 210065, and *Suriano v. Lafeber*, 386 Ill. App. 3d 490 (1st Dist. 2008), are instructive regarding the authority of the court to entertain legal arguments and to issue legally enforceable rulings. The gist of the court's lack of authority is not lack of subject matter jurisdiction but jurisdiction of the parties and the subject matter that is before the court. Without pleadings, neither party is given notice and opportunity to be heard on the ruling or judgment entered by the court. This principle of due process is akin to the principle that "*proof without pleadings is as defective as pleadings without proof.*" (Emphasis added.) *American Standard Insurance Co. v. Basbagill*, 333 Ill. App. 3d 11, 15 (2002) ("A party must recover, if at all, according to the case he has made for himself by his pleadings.) We determine the failure to assign the annuity to Steven was not an abuse of discretion.

¶ 39                                    III CONCLUSION

¶ 40    For the reasons stated, we affirm the judgment of the circuit court of Kendall County.

¶ 41    Affirmed.